**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL W. KELLER,
        *Petitioner-Appellant,*

        v.

COMMISSIONER OF INTERNAL
REVENUE,
        *Respondent-Appellee.*

No. 06-75441

Tax Ct.
9662-01

OPINION

Appeal from a Decision of the
United States Tax Court
Harry A. Haines Presiding

Argued and Submitted
February 3, 2009—Seattle, Washington

Filed February 26, 2009

Before: Betty B. Fletcher, Pamela Ann Rymer and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Rymer

## COUNSEL

Terri A. Merriam, Merriam & Associates, P.C., Seattle, Washington, for the petitioner-appellant.

Anthony T. Sheehan, United States Department of Justice, Tax Division, Washington, D.C., for the respondent-appellee.

## OPINION

RYMER, Circuit Judge:

Michael W. Keller appeals the tax court's order upholding the Commissioner of Internal Revenue's imposition of accuracy-related penalties for his tax underpayment for years 1994 and 1995. Keller now concedes that a 20 percent penalty for negligence is appropriate under 26 U.S.C. § 6662(b)(1)[1] but contests the enhancement to a 40 percent penalty for gross valuation misstatements under § 6662(h). Because we agree with Keller that, under the law of this circuit, his tax under-

---

[1]Except where otherwise noted, all statutory references in this opinion are to the Internal Revenue Code.

payment is not "attributable to" a valuation overstatement, we affirm in part, reverse in part, and remand to the tax court for calculation of the 20 percent negligence penalty.

I

Keller is one of hundreds of individuals who obtained illegitimate tax benefits through the sheep and cattle investment shams directed by Walter J. Hoyt, III. This court is, by now, quite familiar with Hoyt inspired cases. *See, e.g.*, *River City Ranches #1 Ltd. v. Comm'r*, 401 F.3d 1136 (9th Cir. 2005); *Durham Farms, #1 v. Comm'r*, 59 Fed. Appx. 952 (9th Cir. 2003) (unpublished); *River City Ranches #4 v. Comm'r*, 23 Fed. Appx. 744 (9th Cir. 2001) (unpublished). Unlike many of his fellow investors, Keller was not a Hoyt partner — rather, his participation was limited to contributing money as a solo investor.

Keller is employed by the United States government's Military Sealift Command and has been since 1982. In the three years preceding his investment with Hoyt, Keller's income ranged from $70,094 to $107,841. Although Keller first learned of the Hoyt investment scheme as far back as 1985, his interest was piqued in December 1994 by colleagues while on a tour of duty at sea. The captain, and many other shipmates, were partners involved in the business of owning registered cattle.

Keller's colleagues informed him the investment scheme, which afforded significant tax savings, was found to be legitimate by the tax court in the *Bales*[2] case and gave him promotional materials to review. He found the promotional materials persuasive — Hoyt was described as one of the top cattlemen in the industry who had been in business for forty years. In Keller's opinion, if the investment scheme were not legiti-

---

[2]*Bales v. Comm'r*, T.C. Memo. 1989-568 (upholding the legitimacy of the Hoyt investment scheme for tax years mostly in the late 1970s).

mate, it would already have been shut down by the Securities and Exchange Commission. Although Keller recognized he would receive significant tax savings through depreciation deductions at the beginning of the investment, he also claims to have expected a long-term profit.

In February 1995, Keller requested additional information from Hoyt and was contacted by Dave Barnes, a Hoyt representative. Barnes provided promotional materials and asked Keller to fill out a credit application and attach tax returns from the previous years. Eventually the two met at a Hoyt ranch in Elk Grove, California. The meeting lasted several hours and covered the investment opportunity generally and also included a description by Barnes of the outcome in *Bales*. Keller was additionally given independent media publications and cattle count reports.

Keller ultimately decided to invest in late February or early March 1995. He signed a 15-year promissory note to repay $956,980 in exchange for 146 heifers — half of which were only in the embryonic stage at purchase. Other sales documents included a bill of sale, a certificate of warranty, a sales order, and a security agreement. At no time in the purchasing process did Keller ever consult a tax expert or attorney regarding his investment.

Keller made no initial payments, other than a $50 application fee, to Hoyt to finance his investment. Instead, he agreed to allocate 75 percent of the tax savings he enjoyed from the investment back to Hoyt. He did, however, eventually begin making payments on the promissory note of a little over $1,000 each month. Upon finalization of the investment, Hoyt's accounting department immediately began preparing Keller's tax returns for 1994 and 1995.

As it turns out, Keller may not have acquired any cattle in the first instance. During Hoyt and his co-conspirators' criminal trial, the government described the cow shortage as "se-

vere and pervasive." The shortage was growing, and yet nonexistent "phantom" cows continued to be sold to new investors. Additionally, the same cows — as identified by name and ear tag number — were often sold to more than one investor. Regardless, and although the purported cattle purchase did not occur until 1995, Keller's 1994 return contained a Schedule F — the schedule on which profits or losses associated with farming are reported — as did the 1995 return. The 1994 return reported a net loss of $302,818 and the 1995 return a loss of $107,951. Depreciation schedules showed the cost basis of the cattle to be $880,423 in 1994 and $625,100 in 1995.

Because Keller's losses for 1994 were so large and eliminated the totality of his 1994 income taxes with some loss leftover, he was able to carry back losses to eliminate any taxes that had been owed for 1991, 1992, and 1993. Keller was issued a refund of $11,773 for 1994 and a total of $40,740 for the carry back years. Hoyt collected $10,500 for 1994 and $30,500 for the carry back years for his services. Including the allocation of tax savings and the payments made on the promissory note, Keller ultimately paid Hoyt a total of $67,225.

Prior to the filing of the 1995 return, the Commissioner sent Keller notice that deductions stemming from the Hoyt tax shelter were unlikely to be allowable. Any return claiming a refund was to be reduced by the amount generated from the Hoyt investment scheme. It also warned of the accuracy-related penalties under § 6662 that would be applied in appropriate cases. The 1995 return was nonetheless filed, including Hoyt-related deductions, and requested a refund of $8,788. A refund was never issued.

On February 24, 1997, the Commissioner sent Keller a letter informing him that his 1994 and 1995 returns were under examination. A Notice of Deficiency, dated May 3, 2001, was later sent indicating a deficiency of $11,106 for 1994 and

$17,410 for 1995. The Commissioner also assessed accuracy penalties under § 6662(h) of $4,442.40 for 1994 and $6,931.60 for 1995 — that is, an additional amount equal to 40 percent of the underpayment. The deficiency was based on the Commissioner's conclusion that the cattle were not actually being used in a trade or business or to generate income. The 40 percent penalty was applied due to alleged gross valuation misstatements in the claimed value of the cattle.

Keller petitioned the tax court for a redetermination of the deficiency. However, prior to trial, Keller and the Commissioner stipulated that Keller should not have been entitled to any Hoyt-related deductions. The issue at trial was thus reduced to the imposition of accuracy-related penalties. The tax court determined that if Keller had in fact not acquired any cattle, his basis in the cattle would be zero for the relevant tax years, far below the claimed bases, and thus supported the 40 percent penalty for gross valuation misstatements. The court also found the 20 percent penalty for negligence applicable and rejected Keller's other defenses. Accordingly, it upheld the deficiency and penalty amounts in full. This appeal followed.

## II

The factual findings underpinning whether an underpayment is attributable to a valuation overstatement are reviewed for clear error. *Wolf v. Comm'r*, 4 F.3d 709, 715 (9th Cir. 1993). Application of the facts to the requirements of § 6662 is a question of law reviewed *de novo*. *See Gainer v. Comm'r*, 893 F.2d 225, 226 (9th Cir. 1990) (reviewing now-repealed § 6659, a statute also imposing penalties for underpayment attributable to valuation overstatements).

## III

In his briefing before this court, the Commissioner concedes that application of the gross valuation misstatement

penalty to the 1994 tax year was inappropriate because Keller's purported purchase of cattle did not occur until 1995. Keller, on the other hand, concedes that a negligence penalty under § 6662(b)(1) is appropriate for both tax years 1994 and 1995. The question that remains for us is whether, for tax year 1995, the 40 percent penalty for gross valuation misstatements under § 6662(h) should be imposed instead — in other words, whether Keller owes around $7,000 plus interest (as the tax court held) or around $3,500 plus interest (as Keller claims).

**[1]** Section 6662 of the Internal Revenue Code imposes a variety of accuracy-related penalties for tax underpayment. As a general rule, when § 6662 is applicable, the taxpayer is penalized "an amount equal to 20 percent of the portion of the underpayment." § 6662(a). Examples of when the 20 percent penalty applies include taxpayer negligence, § 6662(b)(1), and substantial valuation misstatements, § 6662(b)(3).[3] The 20 percent penalty is enhanced to 40 percent, however, in the case of gross valuation misstatements. § 6662(h)(1). Keller makes no argument that if § 6662(h) applies to him, he did not make a gross valuation misstatement — that is, he does not contest that the claimed value of the cattle was more than 200 percent greater than their actual value.

**[2]** Instead, he challenges whether § 6662(h) is applicable in the first instance. The statute applies to situations where the tax underpayment "is attributable to one or more gross valuation misstatements." § 6662(h)(1). Keller argues his tax underpayment is not "attributable to" the valuation overstatement because he was entitled to no deduction at all, rather

---

[3]The penalties may not be stacked. That is, if a taxpayer is negligent and files a return with a substantial valuation misstatement, the penalty is just 20 percent (rather than combining the two to reach 40 percent). Treas. Reg. § 1.6662-2(c). The same is true if the taxpayer is negligent and files a return with a gross valuation misstatement — the penalty is just the greater of the two, 40 percent, not the two combined.

than simply a reduced deduction. Thus, the underpayment is "attributable to" taking an illegitimate deduction, not overvaluing an asset.

We previously have had occasion to consider the meaning of the words "attributable to" in a similar context. *Gainer v. Commissioner* interpreted "attributable to" in § 6659, now repealed, which also imposed a penalty on taxpayers who underpaid their taxes by overvaluing an asset.[4] In *Gainer*, the taxpayer purchased a 10 percent interest in a refrigerated shipping container for $26,000 (thus, the shipping container's total value was $260,000) by paying $4,500 up front and executing a non-recourse promissory note for the balance. 893 F.2d at 226. The actual fair market value of the container was somewhere between $52,000 and $60,000, leaving the taxpayer's interest truly valued between $5,200 and $6,000. *Id.* Nonetheless, in the 1981 tax year, a depreciation deduction was taken based on the $26,000 purchase price. *Id.* Prior to trial before the tax court, the parties agreed the deduction was improper in the first instance because the container was not placed in service during the 1981 tax year. *Id.* The Commissioner nonetheless sought to impose a penalty for overvaluing the container. *Id.* The tax court refused, reasoning that the taxpayer was not entitled to any deduction regardless of the stated value and thus any underpayment was attributable to taking an unwarranted deduction, not overvaluing the containers. *Id.*

On appeal, this court rejected the Commissioner's argument that "attributable to" actually means "capable of being attributed," as there was no support for such a reading, and in any event, it would just move the inquiry to the meaning of "capable," which could be equally ambiguous. *Id.* at 227. In trying to divine a proper reading of the statute, the court con-

---

[4]Section 6659 applied to any underpayment "which is attributable to a valuation overstatement." Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, Title VII, § 722(a)(1), 95 Stat. 172 (Aug. 13, 1981).

sulted the plain language, dictionary definitions, and legislative history, all without success. *Id.* It ultimately found instructive the *General Explanation of the Economic Recovery Tax Act of 1981*, prepared by the staff of the Joint Committee on Taxation. The *General Explanation* provides a formula for determining when an underpayment is attributable to an overvaluation:

> The portion of a tax underpayment that is attributable to a valuation overstatement will be determined *after taking into account any other proper adjustments to tax liability*. Thus, the underpayment resulting from a valuation overstatement will be determined by comparing the taxpayer's (1) actual tax liability (i.e., the tax liability that results from a proper valuation and which takes into account any other proper adjustments) with (2) actual tax liability as reduced by taking into account the valuation overstatement. The difference between these two amounts will be the underpayment that is attributable to the valuation overstatement.

*Gainer*, 893 F.2d at 227 (citation omitted) (emphasis in original).

Following the formula, the court held that the taxpayer's underpayment could not be said to be "attributable to" the overvaluation of the shipping container. Because the parties stipulated that no deduction was appropriate in the first instance, the tax underpayment did not vary depending on how much the container was overvalued. The tax liability, "after adjusting for failure to place the container in service, was no different from [the taxpayer's] liability after adjusting for any overvaluation." *Id.* at 228. More broadly, we held "when there is some other ground for disallowing the entire portion of a deduction that otherwise might be disallowed for overvaluation," an overvaluation penalty may not be imposed. *Id.*

Our decision in *Gainer* rested in large part on the Fifth Circuit's decision in *Todd v. Commissioner*, 862 F.2d 540 (5th Cir. 1988). *Todd* dealt with precisely the same issue — the same overvalued shipping containers that were likewise not placed in service in the applicable tax years. *Id.* at 540-41. *Todd* also used the *General Explanation* to determine when an underpayment is "attributable to" an overvaluation, *id.* at 542-43, and determined that when a depreciation deduction is not allowed in the first instance, overvaluation of the underlying asset cannot be said to be the cause of the underpayment, *id.* at 543. The *General Explanation* instructs that overvaluation be determined *after* "any other proper adjustment to tax liability" — for example, an adjustment to reflect a wholly improper deduction. *Id.* at 544 (emphasis and quotation marks omitted).

[3] While *Gainer* is arguably distinguishable on its facts — overvaluing a shipping container but failing to put it into service is different from overvaluing cattle you never actually acquire — its rationale is directly on point. When a depreciation deduction is disallowed in total, any overvaluation is subsumed in that disallowance, and an associated tax underpayment is "attributable to" the invalid deduction, not the overvaluation of the asset. Moreover, *Gainer* embraces the formula announced by the *General Explanation* that requires first determining whether any deductions are improper and, only after that, determining whether there is a lingering asset overvaluation. In other words, *Gainer's* holding is such that when a deduction is disallowed in total, an associated penalty for overvaluing an asset is precluded.[5]

[4] Viewing *Gainer* in this light, we conclude the tax court

---

[5]The Fifth Circuit has interpreted its holding in *Todd* in the same way. *See Heasley v. Comm'r*, 902 F.2d 380, 383 (5th Cir. 1990) ("Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit.").

erred in upholding the gross valuation misstatement penalty under § 6662(h) against Keller. Prior to trial, Keller and the Commissioner stipulated that *all* of the Hoyt-related deductions he took were unlawful. Once the totality of the deduction was disallowed, the fact that the cattle purportedly acquired by Keller had a claimed basis far in excess of their true value became irrelevant. Keller's tax deficiency was "attributable to" taking a depreciation deduction to which he was not entitled (at all) rather than "attributable to" overvaluation.[6]

We recognize that many other circuits have concluded that when overvaluation is intertwined with a tax avoidance scheme that lacks economic substance, an overvaluation penalty can apply. *See Merino v. Comm'r*, 196 F.3d 147, 155 (3d Cir. 1999); *Zfass v. Comm'r*, 118 F.3d 184, 190-91 (4th Cir. 1997); *Illes v. Comm'r*, 982 F.2d 163, 166-67 (6th Cir. 1992); *Gilman v. Comm'r*, 933 F.2d 143, 149-52 (2d Cir. 1991); *Massengill v. Comm'r*, 876 F.2d 616, 619-20 (8th Cir. 1989). This sensible method of resolving overvaluation cases cuts off at the pass what might seem to be an anomalous result — allowing a party to avoid tax penalties by engaging in behavior one might suppose would implicate more tax penalties, not fewer. Nonetheless, in this circuit we are constrained by *Gainer*.

This said, Keller's concession of invalid deductions had significant consequences. He was no longer able to argue in the tax court the merits of his deficiencies in tax payment — in other words, he agreed that he owed $11,106 for 1994 and $17,410 for 1995 in back taxes, plus interest.[7] Moreover, Kel-

---

[6]Because *Gainer* controls, we express no opinion on the parties' disagreement over the role of the Commissioner's presumption of correctness. *See Foster v. Comm'r*, 756 F.2d 1430, 1439 (9th Cir. 1985).

[7]It is for this reason that we find no merit in the Commissioner's argument that Keller's concession of invalid deductions was "opportunistic" and should therefore be rejected. While the concession ultimately allows him to avoid an overvaluation penalty, it also confirmed, without any opportunity in court to argue otherwise, that he owed over $28,000 plus interest in back taxes. In any event, the Commissioner agreed to the stipulation at the time and must live with the consequences of that agreement now.

ler now concedes[8] a 20 percent negligence penalty is appropriate for both tax years — a total that approaches an additional $5,700, plus interest. In future cases too, the Commissioner will be able to look to the negligence penalty or other penalties where applicable.

## IV

[5] We hold that *Gainer* and the formula it embraces from the *General Explanation* require the validity of deductions be determined first, and that an overvaluation penalty may only be imposed on any lingering inflated value. Accordingly, the imposition of the gross valuation misstatement penalty for the 1994[9] and 1995 tax years is reversed. Imposition of the 20 percent negligence penalty for both tax years is affirmed. We remand to the tax court to calculate the appropriate penalty, using the 20 percent multiplier, plus interest.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

---

[8]Because counsel for Keller conceded at oral argument, without qualification, that the negligence penalty applies, we have no need to address Keller's argument that he is immunized from accuracy-related penalties by the reasonable cause exception in § 6664(c)(1). Even on the merits, § 6664-based arguments have been rejected by this court, and others, in Hoyt-related cases, and we see no reason why this case would be any different. *See Hansen v. Comm'r*, 471 F.3d 1021, 1030-33 (9th Cir. 2006); *Mortensen v. Comm'r*, 440 F.3d 375, 387-93 (6th Cir. 2006); *Van Scoten v. Comm'r*, 439 F.3d 1243, 1256-60 (10th Cir. 2006).

[9]As noted *supra*, the Commissioner has conceded the penalty should not have been applied in 1994.