**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL W. KELLER,
          *Petitioner-Appellant,*

v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 06-75466

Tax Ct. No.
7530-04L

GARY W. MCDONOUGH,
          *Petitioner-Appellant,*

v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 07-70644

Tax Ct. No.
1201-05L

WILLIAM H. LINDLEY; JO ANNE
LINDLEY,
          *Petitioners-Appellants,*

v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 07-71715

Tax Ct. No.
6657-05L

6625

DONALD ERTZ,
    *Petitioner-Appellant,*

   v.

COMMISSIONER OF INTERNAL
REVENUE,
    *Respondent-Appellee.*

No. 07-71719

Tax Ct. No.
20336-04

FRANKLIN HUBBART; JANETTA
HUBBART,
    *Petitioners-Appellants,*

   v.

COMMISSIONER OF INTERNAL
REVENUE,
    *Respondent-Appellee.*

No. 07-72001

Tax Ct. No.
18722-04L

ROGER CARTER; LORA CARTER,
    *Petitioners-Appellants,*

   v.

COMMISSIONER OF INTERNAL
REVENUE,
    *Respondent-Appellee.*

No. 07-72003

Tax Ct. No.
20719-04

DANIEL O. ABELEIN,
          *Petitioner-Appellant,*

                    v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 07-72004

Tax Ct. No.
24804-04L


BOBBIE E. JOHNSON,
          *Petitioner-Appellant,*

                    v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 07-72010

Tax Ct. No.
20775-04L


GORDON FREEMAN; ILENE FREEMAN,
          *Petitioners-Appellants,*

                    v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 07-72073

Tax Ct. No.
24215-04L

ESTATE OF CAROL ANDREWS,
Deceased; ROBERT ANDREWS,
         *Petitioners-Appellants,*

        v.

COMMISSIONER OF INTERNAL
REVENUE,
         *Respondent-Appellee.*

No. 07-72093
Tax Ct. No.
18174-04

ROY BARNES; ANTONETTE BARNES,
         *Petitioners-Appellants,*

        v.

COMMISSIONER OF INTERNAL
REVENUE,
         *Respondent-Appellee.*

No. 07-72114
Tax Ct. No.
10788-05

ROGER D. CATLOW; MARY M.
CATLOW,
         *Petitioners-Appellants,*

        v.

COMMISSIONER OF INTERNAL
REVENUE,
         *Respondent-Appellee.*

No. 07-72139
Tax Ct. No.
11319-05

BARRY BLONDHEIM; SHERRY
BLONDHEIM,
          *Petitioners-Appellants,*

               v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 07-72654

Tax Ct. No.
15549-05L

DONALD CLAYTON; YVONNE
CLAYTON,
          *Petitioners-Appellants,*

               v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 07-72655

Tax Ct. No.
17704-05L

GARY HANSEN; JOHNEAN F. HANSEN,
          *Petitioners-Appellants,*

               v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 07-72737

Tax Ct. No.
11175-05L

MARTIN SMITH; SHARON SMITH,
   *Petitioners-Appellants,*

v.

COMMISSIONER OF INTERNAL
REVENUE,
   *Respondent-Appellee.*

No. 07-73038

Tax Ct. No.
3876-05L

OPINION

Appeals from the United States Tax Court
Harry A. Haines, United States Tax Court Judge,
and David Laro, United States Tax Court Judge, Presiding

Argued and Submitted February 3, 2009
Submission Vacated February 4, 2009
Submitted May 27, 2009
Seattle, Washington

Filed June 3, 2009

Before: Betty B. Fletcher, Pamela Ann Rymer and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Rymer

---

**COUNSEL**

Terri A. Merriam, Merriam & Associates, P.C., Seattle, Washington, for the petitioners-appellants.

Anthony T. Sheehan, Tax Division, Department of Justice, Washington, D.C., for the respondent-appellee.

---

**OPINION**

RYMER, Circuit Judge:

These consolidated appeals concern the outstanding tax liabilities for sixteen Taxpayers (as we shall refer to the individual partners) who invested in cattle partnerships operated by Walter J. Hoyt III. Their appeals are taken from the decision of the Tax Court holding that the Commissioner of Internal Revenue did not abuse his discretion in rejecting Taxpayers' offers-in-compromise. In collection due process hearings Taxpayers also challenged the imposition of interest under former 26 U.S.C. § 6621(c).[1] The Tax Court held that it lacked juris-

---

[1]All of the partnerships involved in these consolidated actions were subject to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA),

diction in partner-level proceedings to determine whether the partnerships' transactions were tax motivated for purposes of § 6621(c).[2] The effect was to leave standing the Commissioner's inclusion of § 6621(c) interest in his determination of outstanding liabilities. Taxpayers appeal this decision as well.

We agree with the Tax Court's disposition on the offers-in-compromise, and with its view that, under *River City Ranches #1 Ltd. v. Commissioner*, 401 F.3d 1136, 1144 (9th Cir. 2005), whether transactions were tax motivated is a partnership item to be determined at partnership-level proceedings. The problem in these cases is that the partnership-level proceedings were completed and the judgment had become final before *River City Ranches #1* announced this rule. As the Tax Court has jurisdiction in partner-level proceedings to determine issues relating to liability that the taxpayer has had no opportunity to contest, § 6330(c)(2)(B), we believe the court could decide whether the partnership transactions were tax motivated based on the record in the partnership-level proceedings. We are as well situated as the Tax Court to undertake this review and, having done so, we conclude that the record of the partnership-level proceedings shows that the partnerships' transactions were in fact tax motivated.

Accordingly, we affirm in part, vacate in part, and permit the Commissioner to proceed with collection actions as determined by the Notices of Determination.

---

Pub. L. No. 97-248, 96 Stat. 324. The version of § 6621(c) that was in effect for the relevant tax years, 1985 and 1986, increased the statutory interest rate by 120 percent for a "substantial underpayment attributable to tax motivated transactions." § 6621(c) (1988). This version of § 6621(c) was repealed in 1990. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 7721(b), 103 Stat. 2106, 2399 (1989).

[2]All statutory references are to the Internal Revenue Code as codified in Title 26 of the United States Code, unless otherwise noted.

I

This is another in a growing line of cases arising out of the tangled tax liabilities of Hoyt partnerships. *See, e.g.*, *Keller v. Comm'r*, 556 F.3d 1056 (9th Cir. 2009); *Hansen v. Comm'r*, 471 F.3d 1021 (9th Cir. 2006); *River City Ranches #1*, 401 F.3d 1136; *Adams v. Johnson*, 355 F.3d 1179 (9th Cir. 2004); *Abelein v. United States*, 323 F.3d 1210 (9th Cir. 2003); *Phillips v. Comm'r*, 272 F.3d 1172 (9th Cir. 2001). To make a long story short, Hoyt organized, promoted, and operated more than 100 cattle- and sheep-breeding partnerships from the 1970s through the 1990s. The cattle partnerships relevant to these appeals were touted as "The 1,000 lb Tax Shelter." Taxpayers invested in one or more of them.

The Commissioner sought to disallow tax benefits claimed by early partnerships, but lost in the Tax Court in 1989. *See Bales v. Comm'r*, 58 T.C.M. (CCH) 431 (1989). After *Bales*, the Commissioner began to conduct a professional headcount of the Hoyt livestock.

Upon receipt of Notices of Final Partnership Administrative Adjustment (FPAA), Hoyt, who was the tax matters partner (TMP) for each of the partnerships, filed petitions with the Tax Court. Hoyt and the Commissioner settled a number of issues in a May 20, 1993 global settlement agreement that established a $4,000 value for each cow and a formula for determining the actual number of cattle owned by each partnership.[3] The Tax Court determined partnership-level adjustments in accordance with the 1993 Agreement, and issued opinions in 1996 resolving disagreements between Hoyt and the IRS over allocation of the 1980 through 1986 settlement

---

[3]Proceedings to revoke Hoyt's status as an Enrolled Agent were initiated in 1997. He was then indicted, and convicted on thirty-one counts of mail fraud (among other things) on February 12, 2001. *United States v. Hoyt*, No. CR-98-529 (D. Or. 2001), *aff'd*, 47 Fed. Appx. 834 (9th Cir. 2002). Taxpayers were identified as victims.

items to the individual partners. *See Shorthorn Genetic Eng'g 1982-2, Ltd. v. Comm'r*, 72 T.C.M. (CCH) 1306 (1996) (*SGE 82-2*).

Meanwhile, the Commissioner offered a variety of settlements to individual partners that waived accuracy-related penalties, including tax-motivated interest in some instances. When the IRS sent notices of intent to levy, Taxpayers requested a collection due process hearing before the Office of Appeals and submitted their own offers-in-compromise pursuant to § 6330(c)(2)(A)(iii). The standard offer was for Taxpayers to pay all Hoyt tax deficiencies for all years and regular interest accrued through April 15, 1993. The offers were based on grounds of public policy and equity, and eleven Taxpayers also claimed doubt as to collectibility with special circumstances or economic hardship.

The Commissioner's settlement officers issued a Notice of Determination in each case rejecting the compromise offer and upholding collection. In response to the Notices of Determination, Taxpayers petitioned the Tax Court to review whether the Commissioner abused his discretion in sustaining the proposed collection action, and whether Taxpayers are liable for the increased rate of interest on tax-motivated transactions under § 6621(c). The Tax Court held that the settlement officers had not abused their discretion in rejecting Taxpayers' offers-in-compromise or in upholding the proposed levies.

Those Taxpayers who were subject to § 6621(c) penalties agreed to be treated as if they were in the same partnership as Donald C. Ertz, that is the Durham Engineering 1985-5 (DGE 85-5) partnership.[4] For the relevant DGE 85-5 tax years, 1985

---

[4]These taxpayers are Daniel O. Abelein, Estate of Carol Andrews and Robert Andrews, Roy and Antonette Barnes, Barry and Sherry Blondheim, Roger and Lora Carter, Roger D. and Mary M. Catlow, Donald and Yvonne Clayton, Gordon and Ilene Freeman, Franklin and Janetta Hubbart, Bobbie E. Johnson, and Martin and Sharon Smith. When appropriate, we will refer to them collectively as "Ertz Taxpayers," and to their partnerships collectively as "DGE 85-5."

and 1986, the Commissioner sent FPAAs in 1989 and 1990, respectively, that noted the applicability of § 6621(c). In the *DGE 85-5* partnership-level proceedings, the Tax Court applied the 1993 Agreement to adjust DGE 85-5's reported depreciation expenses for 1985 from $669,910 to $68,400 and its qualified investment property from $4,701,120 to $480,000; DGE 85-5's depreciation expenses for 1986 were reduced from $982,534 to $161,040. It also concluded that interest for tax-motivated transactions pursuant to § 6221(c) was an affected item that requires factual determinations to be made at the partner level and that it therefore lacked jurisdiction over the penalties. *See DGE 85-5 v. Comm'r*, No. 22070-89, at 14-15 (T.C. Nov. 27, 1996); *DGE 85-5 v. Comm'r*, No. 28577-90, at 14-16 (T.C. Nov. 27, 1996).[5] In these partner-level proceedings, the Tax Court declined jurisdiction over the Ertz Taxpayers' challenge to tax-motivated interest given that *River City Ranches #1* had held that the character of a partnership's transactions is a partnership item to be determined at the partnership level, and no findings had been made on the § 6621(c) issue at the partnership-level proceeding in *DGE 85-5*.

Taxpayers timely appealed.

## II

We review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." § 7482(a)(1); *Fargo v. Comm'r*, 447 F.3d 706, 709 (9th Cir. 2006). Therefore, review of factual findings is under the clearly erroneous standard and

[5]The Tax Court had adhered to the same view in *River City Ranches #1*, 85 T.C.M. (CCH) 1365 (2003), which, unlike *DGE 85-5*, was appealed. In *River City Ranches #1*, we rejected the Tax Court's view that jurisdiction over § 6621(c) penalties lies only in partner-level proceedings, holding instead that the court has jurisdiction at the *partnership* level to make findings concerning the imposition of penalty interest under § 6621(c). 401 F.3d at 1138, 1143-44.

review of questions of law is *de novo*. *Fargo*, 447 F.3d at 709; *Millenbach v. Comm'r*, 318 F.3d 924, 930 (9th Cir. 2003). Like the Tax Court, our review of the decision by the Commissioner whether to accept an offer-in-compromise is for an abuse of discretion. *Fargo*, 447 F.3d at 709. "Abuse of discretion occurs when a decision is based on an erroneous view of the law or a clearly erroneous assessment of the facts." *Id.* (internal quotation marks omitted). We review factual findings underlying the imposition of a penalty under § 6621(c) for clear error, and the legal conclusions *de novo*. *See Keller*, 556 F.3d at 1058-59; *Wolf v. Comm'r*, 4 F.3d 709, 715 (9th Cir. 1993); *Gainer v. Comm'r*, 893 F.2d 225, 226 (9th Cir. 1990).

## III

**[1]** Congress authorized the Secretary of the Treasury to "compromise any civil or criminal case arising under the internal revenue laws." § 7122(a). The statute directs the Secretary to ensure that taxpayers entering into a compromise "have an adequate means to provide for basic living expenses." § 7122(d)(2). Congress delegated authority to promulgate more detailed guidelines to the Secretary. § 7122(d)(1).

**[2]** The Secretary's regulations allow compromises for doubt as to liability (which is not at issue here); for doubt as to collectibility; and to promote effective tax administration for economic hardship when collection of the normal amount would leave a taxpayer unable to afford basic living expenses, or where compelling public policy or equity reasons are shown and, due to exceptional circumstances, collection of the full amount of tax liability would undermine public confidence in the fairness of tax administration whether or not a similarly situated taxpayer may have paid his liability in full. 26 C.F.R. § 301.7122-1(b). The regulations constrain compromises to promote effective tax administration (that is, compromises based on economic hardship and on grounds of

public policy or equity) to those that would not undermine compliance with the tax laws. *Id.*, § 301.7122-1(b)(3)(iii).[6] "The determination whether to accept or reject an offer to compromise will be based upon consideration of all the facts and circumstances . . . . " *Id.* § 301.7122-1(c)(1). Once a taxpayer establishes a ground for compromise, the determination whether to accept the offer is within the Secretary's discretion. *Id.*

### A

Eleven Taxpayers[7] in these consolidated cases appeal the

---

[6]Section 301.7122-1(b)(3), which governs the ground for compromise based on effective tax administration, provides:

(i) A compromise may be entered into to promote effective tax administration when the Secretary determines that, although collection in full could be achieved, collection of the full liability would cause the taxpayer economic hardship within the meaning of Sec. 301.6343-1.

(ii) If there are no grounds for compromise under paragraphs (b)(1), (2), or (3)(i) of this section, the IRS may compromise to promote effective tax administration where compelling public policy or equity considerations identified by the taxpayer provide a sufficient basis for compromising the liability. Compromise will be justified only where, due to exceptional circumstances, collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner. A taxpayer proposing compromise under this paragraph (b)(3)(ii) will be expected to demonstrate circumstances that justify compromise even though a similarly situated taxpayer may have paid his liability in full.

(iii) No compromise to promote effective tax administration may be entered into if compromise of the liability would undermine compliance by taxpayers with the tax laws.

The regulations as such are not challenged in these cases.

[7]Estate of Carol Andrews and Robert Andrews, Roy and Antonette Barnes, Roger and Lora Carter, Roger D. and Mary M. Catlow, Donald and Yvonne Clayton, Donald Ertz, Franklin and Janetta Hubbart, Bobbie E. Johnson, William H. and Jo Anne Lindley, Gary W. McDonough, and Martin and Sharon Smith.

Tax Court's ruling affirming denial of their offers-in-compromise based on doubt as to collectibility with special circumstances or economic hardship.

[3] A doubt as to collectibility exists where the taxpayer's assets and income are less than the full amount of the outstanding tax liability. 26 C.F.R. § 301.7122-1(b)(2), (c)(2). A compromise based on economic hardship may be entered into when, even though the full liability could be collected, it would cause the taxpayer to be unable to pay his reasonable living expenses. *See id.* §§ 301.6343-1, 301.7122-1(b)(3)(i); *Fargo*, 447 F.3d at 709-710 (noting the statute's focus on basic expenses with an offer-in-compromise alleging economic hardship).[8] Both types of offer trigger the same inquiry into how much of the tax liability can be paid while allowing the taxpayer to retain enough to pay for reasonable living expenses. 26 C.F.R. §§ 301.6343-1(b)(4) (economic hardship means "unable to pay his or her reasonable basic living expenses"); 301.7122-1(b)(2), (3); 301.7122-1(c)(2)(i) ("[a] determination of doubt as to collectibility will include a determination of ability to pay . . . [while] permit[ting] taxpayers to retain sufficient funds to pay basic living expenses").

[4] Under IRS guidelines, the Commissioner may accept a doubt as to collectibility offer that is less than the taxpayer's "reasonable collection potential" (net equity plus future

---

[8]Factors that support, but are not conclusive of, a determination to accept an economic hardship offer include: "(A) Taxpayer is incapable of earning a living because of a long term illness, medical condition, or disability, and it is reasonably foreseeable that taxpayer's financial resources will be exhausted providing for care and support during the course of the condition; (B) Although taxpayer has certain monthly income, that income is exhausted each month in providing for the care of dependents with no other means of support; and (C) Although taxpayer has certain assets, the taxpayer is unable to borrow against the equity in those assets and liquidation of those assets to pay outstanding tax liabilities would render the taxpayer unable to meet basic living expenses." 26 C.F.R. § 301.7122-1(c)(3)(i).

income plus other components of collectibility) (RCP) if "special circumstances" are present. Rev. Proc. 2003-71, § 4.02(2); Internal Revenue Manual § 5.8.1.1.3 (2005) (I.R.M.). The factors the IRS considers for a doubt as to collectibility with special circumstances offer are the same as for an economic hardship offer. I.R.M. § 5.8.4.3.

For each of the Taxpayers, the Commissioner rejected the offer because it was substantially lower than what the RCP calculation showed the Taxpayer could afford to pay. Taxpayers attack the Commissioner's denial of their offers on multiple grounds, but we see no basis to conclude the Commissioner abused his discretion in any of these cases.

[5] A number of Taxpayers argue the Commissioner should have factored into the RCP calculation higher future medical expenses (Andrews, Barnes, Carters, Catlows, Hubbarts, Ertz, Johnson, Lindleys,[9] McDonough, and Smiths). We cannot say the Commissioner clearly erred in considering medical needs by relying on present medical expenses instead of estimating future increases. *See Fargo*, 447 F.3d at 710 (noting that taxpayers' evidence of future medical needs was thin, ambiguous, and speculative); 26 C.F.R. § 301.7122-1(c)(3) (including as a factor in support of hardship that the taxpayer is incapable of earning a living because of a medical condition and it is "reasonably foreseeable" that financial resources will be exhausted providing for care and support).

[6] Some Taxpayers fault the Commissioner for computational mistakes, such as omitting transaction costs or not including a corresponding adjustment to housing expenses when treating the Taxpayer's equity in his home as fully col-

---

[9]We agree with the Tax Court's determination that the Lindleys abandoned their offer based on doubt as to collectibility with special circumstances or economic hardship; on appeal the Lindleys contend the Commissioner erred even if their offer is treated under the standard for a normal doubt as to collectibility offer.

lectible (Barnes, Carters, Catlows, Claytons, Ertz, Hubbarts, Johnson, Lindleys, and McDonough). The Commissioner, however, caught and corrected those mistakes to a significant extent in the Tax Court. Moreover, those relying on miscalculations fail to demonstrate that, allowing for the errors, their offers do not remain below their ability to pay. *Cf. City of Sausalito v. O'Neill*, 386 F.3d 1186, 1220 (9th Cir. 2004) (noting the requirement in the Administrative Procedure Act that " 'due account shall be taken of the rule of prejudicial error' " by courts reviewing agency action) (quoting 5 U.S.C. § 706). For the same reason, to the extent Ertz is correct that the Commissioner's treatment of his home equity and retirement account as fully collectible is inconsistent with 26 C.F.R. § 301.7122-1(c)(3)(i)(example 2), he has not shown this error affected the Commissioner's determination that he could afford to pay more than his offer.

A few Taxpayers attempt to undermine the Commissioner's determination based on evidence that was not part of the record before him (Andrews, Carters, Hubbarts, and Johnson). However, our review is confined to the record at the time the Commissioner's decision was rendered. *See Robinette v. Comm'r*, 439 F.3d 455, 459 (8th Cir. 2006) (observing that appellate review is based on "the administrative record already in existence, not some new record made initially in the reviewing court") (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)); *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998).

**[7]** Beyond this, Taxpayers question whether the Commissioner fully considered their special circumstances, allowed sufficient time to submit information in support of their offers, and provided an opportunity to respond before making a final determination. The Commissioner is not required to perform an investigation, engage in formal fact-finding proceedings, or respond to an offer with a counter-offer. We believe the Commissioner adequately considered each Tax-

payer's offer given the record before him and within the framework established by the statute, regulations, and Manual.[10]

## B

Those Taxpayers who sought compromise based on special circumstances or economic hardship but failed on those grounds, join the rest who claim that exceptional circumstances exist based on considerations of public policy and equity for accepting their offers-in-compromise. They point to two in particular: that they were victims of Hoyt's fraud, and that the Commissioner caused undue delays in resolving their individual tax liabilities.

[8] A compromise to promote effective tax administration based on public policy or equity considerations "will be justified only where, due to exceptional circumstances, collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner." *Id.* § 301.7122-1(b)(3)(ii). "No compromise to promote effective tax administration may be entered into if compromise of the liability would undermine compliance by taxpayers with the tax laws." *Id.* § 301.7122-1(b)(3)(iii).

[9] Taxpayers argue that they were victimized by the Hoyt operation, but no authority requires the Commissioner to accept an offer-in-compromise simply because the taxpayer was a victim of fraud or third-party misdeeds. The Commissioner could certainly consider third-party actions along with

---

[10]We note that this is not necessarily the end of the road. Whether equity is obtainable from an asset is investigated prior to an actual levy, and court approval is required before a principal residence can be seized. 26 U.S.C. § 6334(a)(13)(B), (e); 26 C.F.R. § 301.6334-1(d). Also, a taxpayer may make a new offer. Taxpayers may be entitled to another collection due process hearing if the IRS seeks to collect by levy. 26 U.S.C. §§ 6320(b)(2), 6330(b)(2). Finally, the Office of Appeals retains jurisdiction to consider changes in circumstances. 26 U.S.C. § 6330(d)(2); 26 C.F.R. § 301.6330-1(h).

Taxpayers' own conduct and motivation for investing in the Hoyt partnerships. However, we have never held that being victimized by a tax shelter scheme is alone sufficient to require compromise. Indeed, we have upheld negligence penalties applied by the Commissioner to Hoyt partners, *see Hansen*, 471 F.3d at 1029, and it would be anomalous to require a reduction in liability based on public policy or equity grounds in these cases. Given all the facts and circumstances of Taxpayers' involvement in the Hoyt partnerships, we cannot say that the Commissioner abused his discretion in rejecting their offers. It was reasonable for him to decide that collection of less than the full liability would undermine public confidence in administration of the tax laws, whereas accepting the offers could "undermine compliance by taxpayers." *See* 26 C.F.R. §§ 301.7122-1(b)(3)(ii), (iii).

**[10]** While it did take nearly twenty years to shut down Hoyt's operations and determine individual tax liabilities, the delay is not all that surprising given the complexity of these tax-shelter partnerships. The lengthy time required for the Commissioner — and the courts — to unravel how the Hoyt partnerships really worked is part of the risk assumed by those who chose to invest in them. Taxpayers fault the IRS, rather than the nature of the TEFRA proceedings, for the delay, maintaining that the IRS failed to seek injunctive relief against Hoyt when it knew enough to do so (no later than 1988); waited until 1997 before seeking to revoke Hoyt's status as an Enrolled Agent when it could have done so earlier; and dealt with Hoyt (as TMP) instead of a settlement committee prior to the 1993 Agreement that, among other things, waived the statute of limitations. But focusing on a few steps that the IRS in hindsight might have taken sooner oversimplifies the saga that got side-tracked with the Commissioner's early loss in *Bales*.

**[11]** Taxpayers also submit that resolution of their tax liability took longer than the "average" amount of time it takes to conclude a tax shelter case. They suggest that delay should

somehow be measured by the "average" time, which, they say, is in the range of ten years. However, there is no footing in the statutes or regulations for an arbitrary cut-off, or for requiring the Commissioner to abate penalties and interest once an "average" amount of time for "average" shelters has passed. Indeed, Taxpayers' cases are not that different from *Fargo*, where the individual partners invested in partnerships more than twenty years prior to resolution of their tax liability in our court.[11] We rejected taxpayers' similar argument there, that delays outside their control should not be held against them. *Fargo*, 447 F.3d at 713-14. Although the IRS *may* resolve longstanding cases by foregoing penalties and interest that have accumulated as a result of delay in determining the taxpayer's liability,[12] no authority says that it *must*. Congress advisedly left settlement decisions to the Commissioner's discretion. We conclude that the Commissioner had discretion to find that full payment of the outstanding tax liabilities in these cases would encourage future investors to take care before investing in similar tax shelters, whereas less than full payment would discourage potential investors from researching and monitoring similar investments.

---

[11]*Bales* was tried in 1986 and the opinion, adverse to the Commissioner, was issued in October 1989. The headcount begun by the Commissioner in response to *Bales* had progressed sufficiently by May 1993 for the IRS and Hoyt to enter into a global settlement for tax years 1980 through 1986, and for the IRS to issue FPAAs for later tax years. Partnership-level cases were filed in 1994. The Tax Court issued opinions in 1996 resolving disagreements between Hoyt and the IRS over allocation of the 1980 through 1986 settlement items to the individual partners. *See, e.g.*, *SGE 82-2*. In 1996 and 1997 the court held trials in two test cases for tax years 1987 and later, for which it issued opinions in 1999 and 2000. *See Durham Farms, #1 v. Comm'r*, 79 T.C.M. (CCH) 2009 (2000), *aff'd*, 59 Fed. Appx. 952 (9th Cir. 2003); *River City Ranches #4 v. Comm'r*, 77 T.C.M. (CCH) 2245 (1999), *aff'd*, 23 Fed. Appx. 744 (9th Cir. 2001). The ruling in *River City Ranches #4* was the first on the merits since *Bales* in 1989.

[12]*See* H.R. Rep. No. 105-599, at 289 (1998) (Conf. Rep.) (noting that the IRS may utilize the new authority to make compromises "to resolve longstanding cases by forgoing penalties and interest which have accumulated as a result of delay in determining the taxpayer's liability").

Taxpayers further take issue with the Commissioner's reliance on the Internal Revenue Manual, § 5.8.11 (2005), which gives an example of when an offer-in-compromise may be rejected that is quite close factually to their case but which, they contend, was legal error because the Manual lacks the force of law under *Fargo*.[13] In *Fargo*, taxpayers relied on the Manual in support of their position, and we held that the Internal Revenue Manual "does not have the force of law and does not confer rights on taxpayers." 447 F.3d at 713. By this we did not mean to suggest that it is legal error for the *Commissioner* to be guided by his own guidelines. Nor are we persuaded by Taxpayers' argument that referencing the Manual's most analogous example deprived them of full consideration of the facts and circumstances surrounding their investment. As settlement officers are required by the regulations to do, 26 C.F.R. § 301.7122-1(c)(1), the officers here did look at the facts and circumstances of each case but nevertheless found their decision in Taxpayers' cases was guided by the Manual's example. They did not err in doing so.

Finally, Taxpayers contend that the Commissioner erred by failing to follow the factors that informed the court's decision in *Fargo* affirming the Commissioner's denial of an offer-in-compromise. The factors we identified there as "cutting against" taxpayers were:

> 1) Taxpayers invested in tax shelters, and purely tax-motivated transactions are frowned upon by the Code; 2) no evidence was presented to suggest that

---

[13]In the example, a taxpayer invests in a nationally-marketed partnership, claims investment tax credits from the partnership, the partnership is then audited, the taxpayer rejects the Commissioner's initial settlement offer, litigation by the partnership upholds the Commissioner's determination, and the taxpayer submits an offer-in-compromise supported by the argument that the tax managing partner is at fault and the statutory rules are unfair. The example suggests that compromise on the grounds of equity "would undermine the purpose of both the penalty and interest provisions at issue and the consistent settlement principles of TEFRA."

> Taxpayers were the subject of fraud or deception; 3) the delay that took place was due to well-established TEFRA procedures and the inability of [the TMPs] to negotiate quickly; and 4) the primary incentives created by requiring full payment are to encourage taxpayers to research future investments more carefully and to keep in better contact with financial agents (such as TMPs).

*Fargo*, 447 F.3d at 714 (footnotes omitted). These factors were neither intended as a mantra to be applied to each offer-in-compromise based on grounds of public policy or equity, nor as a minimum requirement for the proper exercise of the Commissioner's discretion. Rather, we mentioned these facts as indicating why, "at the very least," the Commissioner did not abuse his discretion in not accepting the offer-in-compromise in that case. *Id.* Accordingly, the Commissioner had no legal obligation explicitly to consider each of these factors before rejecting Taxpayers' offers-in-compromise. Even so, as in *Fargo*, there are a number of factors here that also cut against, not in favor of, Taxpayers. Taxpayers invested in a "1,000 lb Tax Shelter" which is "frowned upon." While individual partners may have thought or hoped they were investing in a business that would make money, the program was marketed for its tax benefits. Even considering Hoyt's fraud, investors in Hoyt's partnerships have been unable to avoid negligence penalties.[14] The time it took to resolve these cases was, as in *Fargo*, explicable. Also, "the primary incentives created by requiring full payment are to encourage taxpayers to research future investments more carefully and to keep in better contact with financial agents (such as TMPs)." *Fargo*, 447 F.3d at 714. Finally, reducing the risks of participating in tax shelters would encourage more taxpayers to run those risks.

---

[14]*See Hansen*, 471 F.3d at 1029-33; *Mortensen v. Comm'r*, 440 F.3d 375, 387-93 (6th Cir. 2006); *Van Scoten v. Comm'r*, 439 F.3d 1243, 1252-60 (10th Cir. 2006)."

**[12]** In sum, we conclude that the Commissioner was not obliged by compelling considerations of public policy or equity to accept Taxpayers' offers-in-compromise.

IV

We now turn to whether the Commissioner may apply the interest penalty of § 6621(c) to the tax liability of the twelve Ertz Taxpayers.

**[13]** TEFRA established a statutory scheme for separately determining the partnership's tax liability and then the resulting liability of individual partners. Under TEFRA, a partnership files an informational return describing the share of income and expenses attributable to its partners; the individual partners then report their pro rata share of the partnership's tax liability on their individual tax returns. §§ 701, 702, 6221, 6222; *see Kaplan v. United States*, 133 F.3d 469, 471 (7th Cir. 1998). To assure uniformity, TEFRA "intends that adjustments to a partnership tax return be completed in one consistent proceeding before individual partners are assessed for partnership items." *AD Global Fund, LLC ex rel. North Hills Holding, Inc. v. United States*, 481 F.3d 1351, 1355 (Fed. Cir. 2007). Thus, "[a] partnership's tax items, which determine the partners' taxes, are litigated in partnership proceedings — not in the individual partners' cases." *River City Ranches #1*, 401 F.3d at 1144. TEFRA gives a court with jurisdiction over the partnership-level proceedings jurisdiction "to determine all partnership items of the partnership." § 6226(f).

**[14]** Section 6621(c) interest is an "affected item," that is, a partner-level item that is affected by partnership items. § 6231(a)(5). "The nature of [a] partnership['s] transactions" for purposes of § 6621(c) is a "partnership item." *River City Ranches #1*, 401 F.3d at 1144; *see* § 6231(a)(3). Once the 1993 Agreement was reached, the Tax Court determined allocation issues at the partnership level. The difficulty here is

that (consistent with its own then-governing precedent) the court held that § 6221(c) interest was an affected item requiring factual determinations at the *partner* level, therefore it was not within the court's jurisdiction in the *partnership*-level proceedings. This decision was not appealed, but Ertz Taxpayers did challenge § 6621(c) interest in the collection due process, or partner-level, proceedings. Meanwhile, the Tax Court's similar ruling at the partnership-level proceedings in *River City Ranches #1* was appealed. We reversed and remanded, holding that the Tax Court — at the level of partnership proceedings — had jurisdiction to rule on the character of the partnerships' transactions for purposes of § 6621(c) interest. *River City Ranches #1*, 401 F.3d at 1143-44. In the wake of *River City Ranches #1*, the parties asked the Tax Court in these cases to use the findings, or lack thereof, in the *DGE 85-5* partnership-level proceedings to determine whether their partnership transactions were tax motivated. The court declined to do so, believing that its prior decisions could not fairly be interpreted as making those findings or determinations. Given this, and deferring to our decision in *River City Ranches #1* that the character of a partnership's transactions is a partnership item to be determined at the partnership level, the Tax Court concluded that it lacked jurisdiction to determine DGE 85-5's partnership items, including whether its transactions were tax motivated. Accordingly, it did not decide whether Ertz Taxpayers had substantial underpayments of tax resulting from tax-motivated transactions. The net result is that Ertz Taxpayers owe § 6621(c) interest without a court having specifically ruled on any aspect of that interest.

**[15]** We must decide whether, in these circumstances, the Tax Court had jurisdiction in the partner-level proceedings to determine from findings that were made and from the record adduced in the partnership-level proceedings, whether the partnership transactions were tax motivated or not. We conclude that the Tax Court in these partner-level proceedings had jurisdiction to review the decision and evidence in the partnership-level proceedings for this limited purpose.

**[16]** The Tax Court clearly has jurisdiction in a collection due process proceeding to consider issues relating to a taxpayer's liability which the taxpayer has had no opportunity to dispute. *See* § 6330(c)(2)(B). This is true here of issues relating to Ertz Taxpayers' liability for § 6621(c) interest. Unless the Tax Court has jurisdiction to review the partnership-level record, Taxpayers will have no forum for disputing the imposition of § 6621 penalties. While *River City Ranches #1* recognized that jurisdiction lies in the partnership-level proceeding to decide whether partnership transactions are tax motivated, we did not purport to revoke the Tax Court's residual jurisdiction in a partner-level proceeding to entertain issues over which the taxpayer otherwise would have no review. As the Commissioner included § 6621(c) interest in his Notices of Determination, we hold that the Tax Court had jurisdiction to consider Ertz Taxpayers' challenge to the amount of their liability, including liability for additional interest penalties, that the Commissioner determined. In exercising this jurisdiction the Tax Court should not be making an independent judgment at the partner level about whether partnership transactions were tax motivated, but rather should be reviewing the partnership-level proceedings to determine whether the findings and the record there show the character of the partnerships' transactions.

We agree with the Tax Court that no explicit findings were made on partnership-level issues relevant to § 6621(c) interest in *DGE 85-5*. However, we disagree that the court needed to stop at this point. Rather, it could consider what was implicitly found as well. *Cf. Botany Worsted Mills v. United States*, 278 U.S. 282, 290 (1929) (noting "[subsidiary] findings will not support a judgment unless . . . the ultimate fact follows from them as a necessary inference and may be held to result as a conclusion of law"). A necessary implication of what was found in *DGE 85-5* is that the outstanding tax liabilities for 1985 and 1986 were attributable to either an overvaluation or a sham transaction. Either way, the transactions were tax motivated.

The applicable (former) version of § 6621(c) stated:

(1) In general. In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established under this section.

(2) Substantial underpayment attributable to tax motivated transactions. For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

(3) Tax motivated transactions.

> (A) In general. For purposes of this subsection, the term "tax motivated transaction" means —
>
> > (i) any valuation overstatement (within the meaning of section 6659(c)),
> >
> > . . .
> >
> > (v) any sham or fraudulent transaction.

A "valuation overstatement" is defined as "150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis." §§ 6621(c), 6659(c). A "sham or fraudulent transaction" is one that has no "practical economic effects other than the creation of income tax losses." *Sochin v. Comm'r*, 843 F.2d 351, 354 (9th Cir. 1988), *abrogated on other grounds as recognized by Keane v.*

*Comm'r*, 865 F.2d 1088, 1092 n. 8 (9th Cir. 1989). The test for a "sham or fraudulent transaction" is whether "the taxpayer has shown 1) a non-tax business purpose (a subjective analysis), and 2) that the transaction had 'economic substance' beyond the generation of tax benefits (an objective analysis)." *Id.*; *see also Sacks v. Comm'r*, 69 F.3d 982, 988 (9th Cir. 1995).

In the partnership-level proceedings, the Tax Court adjusted the qualified investment property of DGE 85-5 from $4,701,120 to $480,000. Ertz Taxpayers argue that this adjustment cannot fit within the definition of overvaluation (150 percent or more of the actual value) without knowing how many cattle were included in each valuation.[15] The 1993 Agreement established a $4,000 per head value for the cattle; thus the adjustment to $480,000 reflects $4,000 multiplied by 120 cows. Ertz Taxpayers suggest that DGE 85-5's initial valuation of $4,701,120 could represent 784 cattle, which would equal $5,996 per head, and then the overvaluation would be less than 150 percent compared to the $4,000 per head valuation agreed upon in the 1993 Agreement. Essentially, the argument is that the partnership-level record does not conclusively reveal whether DGE 85-5 overvalued the actual number of cattle, included nonexistent cattle, or both.

However, no matter how one cuts it, the difference between the claimed value and the adjusted value is attributable to either an overvaluation or sham transaction. Based on the actual number of cows, 120, DGE 85-5's claimed valuation of $4,701,120 represents a per head valuation of $39,176, roughly ten times the actual value of $4,000. On the other hand, to the extent that Ertz Taxpayers did not overvalue their cattle in excess of 150 percent on the assumption that DGE

[15]The Commissioner relies on a schedule that was not referenced or incorporated in any stipulation in the partnership-level proceedings. We cannot say that the Tax Court necessarily relied on the numbers contained in the Commissioner's schedule, therefore we do not consider it.

85-5's tax returns included at least 664 nonexistent cattle, then the disallowed portion of DGE 85-5's claimed tax benefits was based on cattle it never acquired. It follows that those benefits are the result of transactions that fit within the definition of a factual sham. Viewed either as an overvaluation or as a sham transaction, the effect is the same: underpayment by DGE 85-5 is necessarily "attributable to" a tax-motivated transaction as defined by § 6621(c).

**[17]** Ertz Taxpayers offer no explanation for the underpayment that escapes imposition of § 6621(c) interest. None appears in the record of the partnership-level proceedings. Accordingly, as a Commissioner's ruling "has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong," *Welch v. Helvering*, 290 U.S. 111, 115 (1933), we uphold his imposition of § 6621(c) interest.

Ertz Taxpayers maintain that an overvaluation penalty should nonetheless not apply when a deduction is disallowed in its entirety. *See Keller*, 556 F.3d at 1059-62; *Gainer*, 893 F.2d at 226. While we have held that where a deduction is disallowed in its entirety, any underpayment is not "attributable to" an overvaluation after taking into consideration the effect of disallowing the deduction, *see Keller*, 556 F.3d at 1060; *Gainer*, 893 F.2d at 226-29, the deduction claimed by DGE 85-5 was not disallowed in its entirety. Therefore, *Gainer* and *Keller* do not apply.

**[18]** Finally, Ertz Taxpayers submit that a partner-level determination is needed with respect to whether each partner made the valuation overstatement in good faith. Then-existing § 6659 authorized the Secretary to waive "all or any part of the addition to the tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith." § 6659(e) (1988). By its terms, § 6659(e) only applies to a valuation overstatement

penalty imposed pursuant to § 6659. Section 6621 incorporates the definition of § 6659(c) that a valuation overstatement exists "if the value of any property . . . claimed on any return is 150 percent or more of the amount determined to be the correct amount." Section 6621, however, does not incorporate the discretionary waiver for good faith underpayments in § 6659(e). Ertz Taxpayers point to no authority for interpreting the applicable version of § 6621 to include a good faith exception. To read the statute this way would require us to hold that a statutory provision that explicitly cross-references one part of another provision also implicitly incorporates another part of that other provision. We decline to do this. *See, e.g.*, *Botosan v. Paul McNally Realty*, 216 F.3d 827, 832 (9th Cir. 2000) ("The incorporation of one statutory provision to the exclusion of another must be presumed intentional under the statutory canon of *expressio unius*."). It is "unlikely that Congress would absentmindedly forget to adopt a provision that appears a mere two paragraphs below the subsection it adopted." *Id*. (internal quotation marks omitted).

V

Taxpayers raise a number of issues regarding evidentiary decisions by the Tax Court, including to grant the Commissioner's motion in limine excluding extra-record evidence, to limit trial time and restrict testimony, and to decline to enforce a subpoena for documents from the Treasury Inspector General for Tax Administration. We have considered the record on each of these points, and see no abuse of discretion in the Tax Court's rulings.

VI

**[19]** We conclude that the Commissioner did not abuse his discretion in rejecting offers-in-compromise that did not measure up under IRS guidelines and Treasury Regulations. Contrary to the Tax Court's view, it did have jurisdiction in the partner-level proceedings in these cases to review the record

of partnership-level proceedings to determine whether the partnerships' transactions were tax motivated. Having conducted this review ourselves, we are satisfied that the partnership-level record admits of only one reasonable conclusion — that the partnerships' transactions were either overvalued or sham, thus tax motivated. We therefore vacate the portion of the Tax Court's order and decision in the Ertz Taxpayers' cases that dismisses the claim regarding § 6621(c) for lack of jurisdiction. We affirm the order in each of these sixteen cases to the extent it permits the Commissioner to proceed with the collection action as determined in the Notice of Determination Concerning Collection Action(s).

AFFIRMED IN PART; VACATED IN PART.