T.C. Memo. 2011-125


UNITED STATES TAX COURT


MARK N. SHEBBY, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18841-08L.              Filed June 7, 2011.


Benjamin C. Sanchez and Martin J. Tierney, for petitioner.

James A. Whitten, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  The petitioner, Mark N. Shebby, filed a
petition to challenge the determination of the IRS Office of
Appeals to sustain a levy to collect section 6672 penalties.[1]  We
have jurisdiction to review the determination under section

---

[1]All section references are to the Internal Revenue Code, as
amended.

6330(d).  Mr. Shebby resided in Morgan Hill, California, at the time he filed the petition.

FINDINGS OF FACT

Mr. Shebby and his wife were married in 1999.  They jointly owned their residence on Mill River Lane in San Jose, California. On June 14, 2004, the IRS assessed section 6672 penalties against Shebby for the following six quarterly tax periods:  the second, third, and fourth quarters of 2002 and the first, second, and third quarters of 2003.  On December 30, 2005, Shebby and his wife signed a separate-property agreement.  The agreement provided that Shebby and his wife each gave up any claim to the other's earnings.  The agreement provided that each of them held an undivided one-half interest in the Mill River Lane property as a separate property interest.

On November 1, 2006, Shebby started a business called Pro Se Legal Document Service.

In 2007 Shebby and his wife sold the Mill River Lane property.  They received the proceeds in the form of an $87,890.91 check from a title company, dated August 31, 2007.

On September 20, 2007, the IRS mailed Shebby a notice that it intended to levy on Shebby's property unless Shebby paid $314,378.86, an amount that comprised (1) his unpaid section 6672 penalties for the six quarterly tax periods listed above and (2) accrued interest.  On September 28, 2007, Shebby requested an

administrative hearing with the IRS Office of Appeals.[2]  In his request, Shebby stated that he wished to propose an offer-in-compromise because he was unable to pay the penalties.

In October 2007 Shebby and his wife used $57,481.11 of the proceeds from the sale of the Mill River Lane property to pay the balance due on their joint federal income tax liabilities for tax years 2001, 2002, and 2004.

On December 31, 2007, Shebby ceased doing business as Pro Se Legal Document Service and started a law practice under the name Law Office of Mark N. Shebby.

On April 29, 2008, Raymundo Jacquez, a settlement officer with the San Francisco office of the Office of Appeals, sent a letter to Shebby scheduling a face-to-face meeting on May 29, 2008, to take place at an IRS office in San Jose.  In the letter, Jacquez requested that Shebby submit some financial documents within 14 days; that is, by May 12, 2008.  Among the documents that Jacquez requested was an appraisal of each business in which Shebby had an ownership interest.

In a letter of May 23, 2008, Shebby requested a 30-day postponement of the upcoming May 29 conference.  In a letter of May 27, 2008, Jacquez agreed to postpone the conference to 2 p.m. on June 19, 2008.  Jacquez noted that he had not received any of

---

[2]Shebby states that the request was dated Sept. 27, 2007, but the date on the form was Sept. 28, 2007.

the financial information requested in his April 29, 2008, letter. He agreed to extend the May 12 deadline for submitting the requested documents to June 12.

On June 3, 2008, Shebby sent a letter to Jacquez with some documents. In the letter, Shebby explained that he had operated the business Pro Se Legal Document Service from November 1, 2006, until December 31, 2007, and that on December 31, 2007, Shebby had started a law practice under the name Law Office of Mark N. Shebby. Shebby declined Jacquez' request that he supply an appraisal of his law practice. He said an appraisal of a new law practice was unnecessary. He asked Jacquez to advise him if he was incorrect.

On June 9, 2008, Shebby sent a letter to Jacquez with additional documents. One of the documents was a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals. Shebby did not disclose his wife's income on the form. Also included with Shebby's letter was a Form 656, Offer in Compromise, in which Shebby offered to compromise his penalty liabilities for $5,000. The form contained boxes for the person filling out the form to indicate the reason for the offer. Shebby checked the box "Doubt as to Collectibility". The form required the person filling out the form to check a box to indicate whether the offer was a "Lump sum cash offer", a "Short Term Periodic Payment Offer", or a "Deferred Periodic Payment

Offer". Shebby did not check any of the three boxes. The form advised that if a "Lump sum cash offer" was being made, 20 percent of the amount of the offer had to be sent along with the form. However, Shebby did not include any payment.

In a June 11, 2008, letter to Shebby, Jacquez listed several inadequacies he had found in the information that Shebby provided to him on June 3 and 9. According to Jacquez' letter, the Form 433-A was incomplete because it did not disclose the income of Shebby's wife. Jacquez confirmed that he required an appraisal of Shebby's law practice. Jacquez implied that the sale of the Mill River Lane property appeared to involve dissipated assets, meaning that Shebby had dissipated the proceeds without paying the IRS. Jacquez acknowledged that he had received a telephone message from Shebby's lawyer requesting that the face-to-face conference be changed to a telephone conference.

Shebby responded to the June 11 letter with a letter dated June 16, 2008. In his letter, Shebby requested--again--that the upcoming June 19 meeting be changed from a face-to-face meeting to a telephone conference. The letter said that the income of Shebby's wife was irrelevant because Shebby had signed a separate-property agreement with her. The letter asserted that it was unreasonable to require an appraisal of the law practice. The letter claimed that the proceeds from the sale of the Mill River Lane property were used to pay attorney's fees and the

Shebbys' past due joint federal income tax liabilities.  In a letter dated June 17, 2008, Shebby supplemented his response to Jacquez of June 16, 2008.  The supplementary response is not relevant to the errors that Shebby alleges were made by the Office of Appeals.

On June 18, 2008, Jacquez sent a letter responding to the June 16 and 17 letters.  In the letter, Jacquez asserted that the income of Shebby's wife was relevant and asked Shebby whether the separate-property agreement had been created in order to avoid collection of the section 6672 penalties.  He also asked for proof that the remainder of the proceeds from the Mill River Lane property sale was consumed by attorney's fees, as Shebby had claimed in his June 16 letter.  Jacquez also advised Shebby that the offer-in-compromise could not be processed without a 20-percent payment.

In a letter that he faxed to Jacquez at 9:58 a.m. on June 19, 2008, Shebby responded to Jacquez' letter of June 18. Shebby's letter did not answer Jacquez' question about the reason for the separate-property agreement because, Shebby claimed, a separate-property agreement cannot be considered a fraudulent conveyance.  Shebby's letter did not supply proof that the remainder of the proceeds of the Mill River Lane property sale was consumed by attorney's fees.  In the letter, Shebby explained that he had not made the 20-percent payment because he thought no

payment was necessary until the Office of Appeals accepted the offer-in-compromise. However, Shebby said, he would make the payment "if you so require."

On June 19, 2008, Jacquez (the settlement officer) conducted a telephone conference with Shebby's lawyer. Shebby summarized the telephone conversation in a letter sent to Jacquez the same day. According to the letter, Shebby's counsel had told Jacquez that Shebby was willing to make a "down payment", but Jacquez had said it was too late. Shebby's letter enclosed a check for $5,000, which was the entire amount of Shebby's offer-in-compromise, but the letter stipulated that the check could be applied by the IRS only if the IRS accepted the proposed offer-in-compromise. On June 19, Jacquez returned the $5,000 check to Shebby.

On June 30, 2008, the IRS Office of Appeals issued a notice of determination. The determination stated that Shebby's offer-in-compromise could not be processed because Shebby had not provided an original, signed, offer-in-compromise containing terms. (The offer submitted by Shebby on June 9, 2008, did not indicate a payment plan.) It also stated that Shebby had not submitted a payment with the offer-in-compromise. The determination recounted that Jacquez generally found Shebby's documentation inadequate. It noted that Shebby had refused to supply an appraisal of his law practice. The determination

stated that there was a disparity between the $2,740 in gross monthly income Shebby reported on the Form 433-A and the fact that, during 2007, $112,239 was deposited into a personal bank account Shebby had with his wife to pay household expenses. The determination stated that Shebby had dissipated escrow funds of $87,890 without documenting how the money was spent. The notice determined that the levy on Shebby's property should be made.

OPINION

Before the IRS can levy on property, it must afford the taxpayer the opportunity for a hearing. Sec. 6330(a)(1). At the hearing, the taxpayer may raise any relevant issue relating to the unpaid tax or to the proposed levy, including an alternative to collection such as an offer-in-compromise. Sec. 6330(c)(2)(A)(iii). Any issue so raised by the taxpayer must be considered by the Appeals officer. Sec. 6330(c)(3).

Shebby's sole complaint about the determination by the Office of Appeals concerns his $5,000 offer-in-compromise. Settlement Officer Jacquez, who served as the Appeals officer, rejected the offer-in-compromise. A rejection of an offer-in-compromise is reviewed by the Tax Court for abuse of discretion. Keller v. Commissioner, 568 F.3d 710, 716 (9th Cir. 2009), affg. in part and vacating in part T.C. Memo. 2006-166, Barnes v. Commissioner, T.C. Memo. 2006-150, Clayton v. Commissioner, T.C. Memo. 2006-188, Blondheim v. Commissioner, T.C. Memo. 2006-216,

Lindley v. Commissioner, T.C. Memo. 2006-229, McDonough v. Commissioner, T.C. Memo. 2006-234. An abuse of discretion occurs when a decision is based on (1) an erroneous view of the law or (2) a clearly erroneous assessment of facts. Id. As we explain below, we find that Jacquez did not abuse his discretion in rejecting Shebby's $5,000 offer-in-compromise. First, the offer-in-compromise was not accompanied by a payment of tax. Second, Shebby refused to supply Jacquez with an appraisal of his law practice, thus impairing Jacquez's ability to evaluate the amount that the IRS could reasonably collect from Shebby. Third, Shebby thwarted Jacquez' attempts to determine whether his separate-property agreement with his wife was a fraudulent conveyance. Fourth, Shebby failed to establish whether he had dissipated the proceeds of the sale of his residence.

1.    Shebby's Offer-in-Compromise Was Not Accompanied by a Partial Payment of Tax.

On June 9, 2008, Shebby furnished a Form 656 to Jacquez. On the form Shebby indicated that he wished to compromise his penalty liabilities for $5,000. Shebby did not check a box to indicate whether the payment would be made in a lump sum or in periodic payments. The form contained a preprinted explanation that a payment of 20 percent of the lump-sum offer had to be sent with the Form 656. Shebby did not enclose a check with the form. On June 18, 2008, Jacquez sent a letter to Shebby warning him that the offer-in-compromise could not be processed without the

20-percent payment.  In a letter of June 19, 2008, Shebby explained that he had thought the 20-percent payment was not necessary until the Appeals Office accepted the offer-in-compromise.  However, Shebby stated he would still make the payment "if you so require."  After the telephone conference on June 19, 2008, Shebby wrote a letter to Jacquez stating that at the conference Jacquez had advised that Shebby's offer-in-compromise could not be processed because he had failed to make the 20-percent payment; and that Shebby's counsel had told Jacquez that Shebby was willing to remit the 20-percent payment, but only if Jacquez provided the "established Appeals Office protocols and administrative procedures" requiring such a payment.  (On the basis of Jacquez' notes of the telephone conversation, it appears that Shebby's letter was an accurate, but incomplete, summary of the telephone conversation.)  A check for $5,000 was attached to Shebby's postconference letter.  Instructing the IRS not to cash the check until the offer-in-compromise had been accepted, Shebby's letter said:  "in order to protect our position we advised you that we would remit the enclosed amount of $5000 to be applied by the IRS only upon acceptance of our proposed offer in compromise, and returned to us upon your refusal to accept our offer."  Later in the day, Jacquez returned the $5,000 check to Shebby.  In a letter, Jacquez explained:

> we cannot accept the check drawn from you [sic] bank
> account, which does not state anywhere on the check how
> it is to be applied, particularly under the terms you
> have stated.  You state that you want the check
> "returned to us upon refusal to accept our offer."
> Since we cannot return funds submitted in an offer your
> check is being returned as not processable as well.  We
> cannot accept such a check, under such conditions.

In the June 30, 2008, notice of determination, the Office of Appeals explained that Shebby's offer-in-compromise could not be processed.

Because of Shebby's failure to unconditionally remit the 20-percent payment, the Office of Appeals did not err in determining that the offer-in-compromise could not be processed.  Section 7122(c)(1)(A)(i) provides:  "The submission of any lump-sum offer-in-compromise shall be accompanied by the payment of 20 percent of the amount of such offer."[3]  The $5,000 check was conditioned upon the IRS' accepting the offer, and therefore it was not a payment but a refundable deposit.  The Office of Appeals did not err in returning the $5,000 check and in deeming the offer-in-compromise not processable.

---

[3]The 20-percent downpayment requirement, which was added by the Tax Increase Prevention and Reconciliation Act of 2005, Pub. L. 109-222, sec. 509(a) and (d), 120 Stat. 362, 364 (2006), applies to all lump-sum offers-in-compromise made after July 16, 2006.  According to the report of the Committee on Conference:  "The provision requires a taxpayer to make partial payments to the IRS while the taxpayer's offer is being considered by the IRS."  H. Conf. Rept. 109-455, at 234 (2006).  The report said that offers "submitted to the IRS that do not comport with [this requirement] are returned to the taxpayer as unprocessable and immediate enforcement action is permitted."  Id.

2.  <u>Shebby Refused To Provide an Appraisal of His Law Practice</u>.

Shebby operated a sole proprietorship called Pro Se Legal Document Service.  Apparently, this business ended in December 2007, when Shebby began his legal practice under the name Law Office of Mark N. Shebby.  On April 29, 2008, Jacquez asked Shebby for an appraisal of each business in which Shebby owned an interest.  In a letter of June 3, 2008, Shebby stated that an appraisal of a new law practice was not necessary.  Shebby stated:  "If I am incorrect in this assumption, please so advise me."  In a letter of June 11, 2008, Jacquez confirmed to Shebby that an appraisal of the law practice was required.  On June 16, 2008, Shebby wrote a letter to Jacquez claiming that it was unreasonable to require an appraisal of his law practice.  The notice of determination of June 30, 2008, in which the Office of Appeals explained that Shebby's offer-in-compromise could not be processed, cited Shebby's refusal to supply an appraisal of his law practice.

Shebby continues to argue that it was unreasonable for Jacquez to demand an appraisal of Shebby's law practice.  He says that because the law practice had been in existence only since January 2008, it would have had no goodwill a few months later. The IRS argues that the Office of Appeals acted reasonably in requesting an appraisal and, when Shebby refused to provide the

appraisal, in determining that the offer-in-compromise could not be processed.

Section 7122(a) authorizes the IRS to "compromise any civil or criminal case arising under the internal revenue laws." Section 7122(d)(1) authorizes the Treasury to prescribe guidelines for IRS employees to use to determine whether an offer-in-compromise should be accepted. Regulations issued pursuant to section 7122(d)(1) set forth three grounds for an offer-in-compromise: (1) doubt as to collectibility, (2) doubt as to liability, and (3) promotion of effective tax administration. Sec. 301.7122-1(b), Proced. & Admin. Regs. Shebby's offer-in-compromise was based on doubt as to collectibility. Under IRS guidelines, an offer-in-compromise based on doubt as to collectibility is generally justified if the amount of the offer is reasonably near the amount the IRS could collect through other means. Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517. This latter amount, referred to as the "reasonable collection potential", takes into account the taxpayer's reasonable basic living expenses. Id. Section 301.6330-1(e), Proced. & Admin. Regs., provides that during a levy hearing, "Taxpayers will be expected to provide all relevant information requested by Appeals, including financial statements, for its consideration of the facts and issues involved in the hearing." When an Appeals officer refuses to consider an offer-

in-compromise because of a taxpayer's failure to provide financial information, courts have held that there was no abuse of discretion.  See, e.g., <u>Lance v. Commissioner</u>, T.C. Memo. 2009-129, 97 T.C.M. (CCH) 1670, 1672.

Shebby's business at the time of the hearing was apparently a newly formed law practice.  To say that Jacquez should have assumed that the practice had no value would inappropriately substitute our judgment for his.  Perhaps the legal practice was some sort of continuation of Shebby's prior business.  Or perhaps Shebby had just landed a big client.  The Office of Appeals did not abuse its discretion by requiring an appraisal of Shebby's law practice.

3.  <u>Shebby Refused To Supply Information to Jacquez Necessary To Determine Whether the Separate-Property Agreement Was a Fraudulent Conveyance</u>.

On June 14, 2004, the IRS assessed large section 6672 penalties against Shebby.  Shebby and his wife signed a separate-property agreement on December 30, 2005.  Section 9 of the agreement stated that all income earned after they were married would be considered the separate property of the party earning the income "as though the marriage had never occurred."  Thus, Shebby purported to give up any claim to his wife's earnings.  On June 9, 2008, Shebby submitted a Form 433-A that did not disclose his wife's income.  On June 11, 2008, Jacquez notified Shebby that the Form 433-A was incomplete because it failed to include

his wife's income. On June 16, 2008, Shebby wrote Jacquez that the income of his wife was not relevant because of the separate-property agreement. On June 18, 2008, Jacquez sent a letter to Shebby asserting that the income of his wife was indeed relevant, and asked Shebby whether the separate-property agreement had been created to avoid collection of Shebby's section 6672 liabilities. On June 19, 2008, Shebby sent a letter to Jacquez reiterating that the income of his wife was not legally relevant, arguing: "The Office of Chief Counsel has litigated, and lost, the issue of whether a post nuptial separate property agreement amounts to a fraudulent conveyance of future income. The courts have rejected this position." The notice of determination issued by the Office of Appeals on June 30, 2008, recounted Shebby's refusal to supply documentation to Jacquez.

Shebby continues to argue that because he had disavowed any claim to his wife's income in the 2005 separate-property agreement, his wife's income was not relevant to what the IRS could collect from him. Shebby argues that the record is devoid of any proof adduced by the IRS that the purpose of the separate-property agreement was to defraud creditors. We reject Shebby's arguments, as explained below.

The regulations provide that in determining whether to accept an offer-in-compromise, the IRS should consider whether the taxpayer made a fraudulent transfer of property to the

taxpayer's nonliable spouse.  Section 301.7122-1(c)(2)(ii),

Proced. & Admin. Regs., provides:

> (ii) Nonliable spouses —(A) In general. Where a taxpayer is offering to compromise a liability for which the taxpayer's spouse has no liability, the assets and income of the nonliable spouse will not be considered in determining the amount of an adequate offer.  The assets and income of a nonliable spouse may be considered, however, to the extent property has been transferred by the taxpayer to the nonliable spouse under circumstances that would permit the IRS to effect collection of the taxpayer's liability from such property (e.g., property that was conveyed in fraud of creditors), property has been transferred by the taxpayer to the nonliable spouse for the purpose of removing the property from consideration by the IRS in evaluating the compromise, or as provided in paragraph (c)(2)(ii)(B) of this section.  The IRS also may request information regarding the assets and income of the nonliable spouse for the purpose of verifying the amount of and responsibility for expenses claimed by the taxpayer.

> (B) Exception. Where collection of the taxpayer's liability from the assets and income of the nonliable spouse is permitted by applicable state law (e.g., under state community property laws), the assets and income of the nonliable spouse will be considered in determining the amount of an adequate offer except to the extent that the taxpayer and the nonliable spouse demonstrate that collection of such assets and income would have a material and adverse impact on the standard of living of the taxpayer, the nonliable spouse, and their dependents.

Under California law, a separate-property agreement between a tax

debtor and the debtor's spouse can constitute a fraudulent

transfer.[4]  In an attempt to determine whether Shebby's separate-

---

[4]In State Bd. of Equalization v. Doreen H.Y. Woo, 98 Cal. Rptr. 2d 206, 207 (Ct. App. 2000), James Ho owed over $37,000 in taxes to the State of California.  The state tax authority

(continued...)

property agreement with his wife was a fraudulent transfer, Jacquez asked Shebby why the agreement had been signed. Shebby refused to answer the question. Having thus thwarted Jacquez's inquiry, Shebby cannot now argue that Jacquez failed to prove that the agreement was a fraudulent transfer. The Office of Appeals determined that the earnings of Shebby's wife were potentially relevant to the reasonable collection potential. We find no abuse of discretion in this determination.

4.   Dissipation of Mill River Lane Property Sale Proceeds

Shebby and his wife jointly owned a residence at Mill River Lane in San Jose. On June 14, 2004, the IRS assessed section 6672 penalties against Shebby. In December 2005 Shebby and his wife signed a separate-property agreement leaving each of them an undivided one-half interest in the Mill River Lane property as a separate property interest. In 2007 Shebby and his wife sold the Mill River Lane property. They received $87,890.91 in proceeds. They used $57,481.11 of the money to pay their joint federal income tax liabilities for tax years 2001, 2002, and 2004. On

---

⁴(...continued)
notified Ho's wife that it would seek an earnings-withholding order against her to pay her husband's tax debt. Id. Four months later, Ho and his wife entered into a separate-property agreement. Id. The wife subsequently became employed by Wells Fargo Bank, earning approximately $500,000 per year. Id. The state court held that Ho had had a present interest in his wife's earnings at the time he executed the marital agreement and that his attempt to transmute the community-property earnings into her separate property constituted a fraudulent transfer. Id.

June 16, 2008, Shebby wrote a letter to Jacquez claiming that the rest of the proceeds had been "used to cover attorneys fees". On June 18, 2008, Jacquez sent a letter to Shebby asking for proof that this was the case. Shebby never responded to this inquiry. The notice of determination of June 30, 2008, stated that Shebby had dissipated the $87,890 and had failed to document how the money was spent. The Office of Appeals determined that the reasonable collection potential should be increased by $87,890.91.[5]

Shebby argues that the Office of Appeals erred. First, Shebby argues that his share of the $87,890.91 in proceeds was $43,945 and that he used his entire $43,945 share to pay part of the delinquent joint income taxes. Thus, Shebby maintains, he did not dissipate the proceeds but rather paid his entire share of the proceeds to the IRS. This argument presumes, incorrectly, that the Shebbys' income-tax liabilities were paid with the $43,945 belonging to Shebby and not the $43,945 that belonged to his wife. In fact, the $57,481.11 in checks that paid the joint income-tax liabilities came from the lawyer who represented both Shebby and his wife. It would have been reasonable to assume

---

[5]Internal Revenue Manual pt. 5.8.5.5(5) (Sept. 23, 2008) directs that the Appeals officer should add the value of dissipated assets to the reasonable collection potential. In this context, the term "dissipated assets" means assets that have been sold, given as gifts, transferred, or spent on nonpriority items or debts and are no longer available to pay the tax liability. Id. pt. 5.8.5.5(1).

that the $57,481.11 was paid out of both spouses' property. Under this assumption, of Shebby's $43,945 share of the proceeds, only $28,741 (that is, one-half of the $57,481.11 income-tax payment) was paid by Shebby toward the joint income tax liabilities; the remainder--$15,204--was unaccounted for.  It may have been a dissipated asset.[6]

As a fallback argument, Shebby argues that the difference between the proceeds ($87,890.91) and the income tax payments ($57,478.11), a difference of approximately $30,000, was paid to "attorneys".  But Shebby declined to substantiate this.  In the absence of information about the remaining $30,000, the Office of Appeals did not abuse its discretion in finding that at least a portion of the $87,890.91 in proceeds was dissipated.[7]

---

[6]The IRS concedes in its brief that Jacquez calculated that the entire share of the proceeds ($87,890.91) should be included in reasonable collection potential.  One might argue that the amount included should have been limited to $15,204, the unaccounted portion of Shebby's share of the proceeds.  But the error Shebby complains of is greater; he believes that Jacquez should have included zero in reasonable collection potential.  We decline to consider whether a lesser error (not including $15,204 in reasonable collection potential) would constitute an abuse of discretion.

[7]Besides the four reasons discussed here, the notice of determination also relied on the disparity between Shebby's monthly gross income and the amounts of deposits into the joint checking account that was maintained by Shebby and his wife for household expenses.  Because the notice supplied other independent reasons for rejecting Shebby's offer-in-compromise, we need not consider whether it was an abuse of discretion for the settlement officer to consider the disparity between Shebby's reported income and the deposits into the checking account.

The Appeals Office did not abuse its discretion when it refused to accept Shebby's offer-in-compromise and decided that the levy should proceed.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.