T.C. Memo. 2016-82

UNITED STATES TAX COURT

MICHAEL D. BROWN AND MARY BROWN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19738-14L.                    Filed April 28, 2016.

<u>Steven R. Mather</u>, for petitioners.

<u>Jenny Wang</u>, <u>Ronald F. Gari</u>, and <u>David L. Rice</u>, for petitioner Mary Brown.

<u>Jeri L. Acromite</u>, for respondent.

MEMORANDUM OPINION

COHEN, <u>Judge</u>:  This case was commenced in response to a notice of

determination concerning collection action(s) under section 6320 and/or 6330,

sustaining both the filing of a notice of Federal tax lien (NFTL) to secure

petitioners' unpaid Federal income tax liabilities for  2001, 2002, 2004, 2005, and

[*2] 2006 (years in issue) and jeopardy levy actions to collect those liabilities. The issues for decision are whether it is necessary to consider the testimony of petitioners' witness, which is not part of the administrative record, and whether there was an abuse of discretion by the Internal Revenue Service (IRS) Office of Appeals (Appeals Office) settlement officer in sustaining the levies and the filing of the NFTL for the years in issue. All section references are to the Internal Revenue Code in effect at all relevant times.

FINDINGS OF FACT

All of the material facts are contained in the administrative record of the exchanges between petitioners and their representative and the Appeals Office. That record has been stipulated. The stipulated facts are incorporated in this opinion by this reference. Petitioners resided in California when they timely filed their petition.

Michael D. Brown (petitioner) is a life insurance salesman with a high-net-worth clientele. The IRS audited petitioners' 2001 through 2006 tax returns and subsequently sent a notice of deficiency to petitioners for each year. Upon the basis of these notices, petitioners petitioned this Court--earlier and separately from this case--with respect to their liabilities for income tax and related penalties for 2001, 2002, 2003, 2004, 2005, and 2006 at docket Nos. 2360-07, 1097-07,

[*3] 649-08, 721-09, 31012-09, and 5108-11, respectively (tax deficiency cases). Pursuant to settlements made by the parties on May 4, 2012, the IRS subsequently calculated petitioners' total tax liability, including penalties and interest, at approximately $33.5 million for the years in issue (2003 was not included as there remained an outstanding issue for trial).

Prompted by the amount of petitioners' liability and IRS-determined factors such as petitioner's foreign bank accounts in tax haven jurisdictions, his concealment of assets through nominees, and his having listed petitioners' personal residence for sale at $17.7 million, the IRS decided to make a jeopardy assessment regarding the years in issue. Through a memorandum dated October 26, 2012, IRS Chief Counsel's Associate Area Counsel approved the jeopardy assessment and related jeopardy levies. Form 2644, Recommendation for Jeopardy/Termination Assessment, was approved by several IRS employees but was not signed by the Area Director, California. On October 30, 2012, the IRS made the jeopardy assessment against petitioners for the years in issue. The IRS sent two notices, both dated October 31, 2012, to petitioners regarding the tax years in issue: Letter 1584, Notice of Jeopardy Assessment and Right of Appeal, signed by the Area Director for the California Area of the IRS Small Business/Self-Employed (SB/SE) Examination division, and Letter 2439A, Notice

[*4] of Jeopardy Levy and Right of Appeal, which included copies of several Forms 668-A, Notice of Levy, the originals having been sent to entities suspected of holding funds or assets of petitioners. These notices were shortly followed by Letter 3172, Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320, sent by the IRS on November 1, 2012, to petitioners with respect to the years in issue.

Petitioners sent a letter to the IRS dated November 30, 2012, stating their intent to appeal the jeopardy assessment and jeopardy levies. In the letter, petitioners disagreed with the factors constituting the basis for the jeopardy assessment, as well as the assessed amount. They stated that the levies were unnecessary and unwarranted and further stated that any jeopardy as to the collection of the tax they owed could be avoided if IRS Counsel--or, alternatively, the Appeals Office--would consider their proposal to provide a security interest in certain property.

Additionally, petitioners timely sent to the Appeals Office Form 12153, Request for a Collection Due Process or Equivalent Hearing. In an attachment to the form, petitioners explained that they were concurrently appealing their jeopardy determinations with another IRS department and that this hearing request was being protectively filed in the event that the jeopardy determinations were

[*5] ultimately sustained.  They requested that this collections appeal be held in suspense pending the outcome of their appeal of the jeopardy determinations, which might include legal proceedings as well.  If the IRS ended up sustaining the jeopardy determinations, petitioners alleged that they did not have the present ability to pay and that an alternative collection arrangement would need to be made so that they could pay the tax over an extended period.  They also stated that because they did not have regular income, a traditional installment agreement would not be workable but that, if necessary, they would submit a detailed collection alternative proposal for consideration.

The Appeals Office processed petitioners' Form 12153 and, on or around February 1, 2013, assigned a settlement officer to review, through a section 6330 hearing, the portion of their dispute regarding IRS collection actions.  The assigned settlement officer reviewed IRS transcripts and computer records of petitioners' account and concluded that the requirements of applicable law and administrative procedure had been met and that the collection actions taken were appropriate under the circumstances.

The settlement officer sent an acknowledgment letter, dated February 4, 2013, to petitioners informing them that he had scheduled a telephone conference for November 14, 2013, which would be the primary opportunity for petitioners to

[*6] discuss their disagreement and any collection alternative. The nine-month hiatus in terms of scheduling the conference was, apparently, his deference to petitioners' desire for the hearing to be held in suspense pending the outcome of their separate appeal of the jeopardy assessment. The acknowledgment letter also informed petitioners of the possible issues that could be considered, such as a collection alternative to the levy actions, and the requirement for them to provide a completed Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, by October 31, 2013, if they wanted him to consider a collection alternative.

On February 13, 2013, the settlement officer spoke with petitioners' representative for the section 6330 hearing. The representative asked whether he could move the conference date to an earlier date if necessary, pending the outcome of petitioners' other options (presumably the jeopardy assessment appeal and the tax deficiency cases). The settlement officer said that he could and that the representative should call him "in that event to reschedule". The case then essentially lay dormant until the scheduled conference date.

On November 14, 2013, in preparation for the conference, the settlement officer noted that he had not yet received a completed Form 433-A as requested in

**[*7]** the acknowledgment letter.  He also verified that petitioners still had balances owing.

During the telephone conference petitioners' representative stated that their only distrainable asset was the $5 million equity in their principal residence that was held in a family trust.  He stated that petitioner planned to pay the IRS by attempting to secure financing to buy a pool of life insurance policies that would produce income.  He promised to have a detailed proposal to the settlement officer by November 30, 2013.

After granting petitioners an extension to provide their proposal by December 9, 2013, the settlement officer received a 300-plus-page document on December 12, 2013, which presented a payment arrangement alternative to the collection actions.  The first five pages of the proposal outlined how the arrangement would work, as follows in part:

> Typically, a policy is purchased from the elderly person at a discount from the death benefit (thus, giving the elderly person the opportunity to spend or invest the cash during their lifetime) and then packaged by the purchaser into a portfolio of such policies.  The portfolio can then be sold on the open market to investors.
>
> A typical portfolio consists of approximately 10 policies with an aggregate death benefit of approximately $50 million.  The average age of the insured individuals is typically around 82 years, with an average life expectancy of about 8 years.  (Obviously, some of the insured individuals will die in less than 8 years and some will live

[*8] longer than 8 years.)  An investor who purchases a portfolio of policies can either take a risk as to the mortality rate of the insured individuals, or the investor can purchase insurance, known as Mortality Protection Insurance Coverage ("MPIC"), which will insure that 75% of the forecasted death benefit will be paid out in each of the first 15 years of the MPIC coverage.

The cost to acquire a $100 million portfolio is around $10 million and the cost of the MPIC coverage on such a portfolio is around $2 million.  Bank financing from a bank in Germany, North Channel Bank, is available to cover half of those costs.  In addition, the bank financing will also cover 100% of the premiums that will be due on the policies.

The document went on to explain that insurance payment proceeds would be distributed as determined by two contracts, a Securities Account Control and Custodian Agreement (SACCA), which would retain Wells Fargo Bank to act as a custodian of the proceeds, and an Intercreditor and Security Agreement.  These agreements would cause the insurance funds to be distributed in the following priority: (1) Wells Fargo Bank fees; (2) pro rata repayment of the bank loan, including interest; (3) reimbursement to the MPIC insurer if death benefits were to exceed MPIC insurance payments already made; (4) additional payment on the bank loan if the loan-to-value ratio goes below 50%; and (5) distribution to the holder of the Net Insurance Benefit (NIB) that, under these circumstances, would most likely be a Luxembourg entity known as a "SARL" that is indirectly controlled by the underlying investor.  The example projected an expected return

**[*9]** of $33.8 million over a 15-year period, which, at a 3% discount rate, would have a net present value of approximately $26.15 million, an amount estimated to be about the same as petitioners' current tax liability.

The document explained how petitioner proposed to satisfy the tax liability by first borrowing $6 million from an unidentified source and $6 million from North Channel Bank. With those funds he would acquire, through a SARL, two $50 million portfolios of life insurance policies insuring individuals of approximately 82 years of age. Each portfolio would have an accompanying MPIC policy, as well as a SACCA with Wells Fargo Bank that, in effect, would direct NIBs to be paid to an intermediary who in turn would be legally obligated to pay the IRS. This provision was deemed necessary because it would be "impractical to name the IRS as the holder of the NIBs". Because they needed to make payments over a 15-year period, petitioners offered to consent to an extension of the period of limitations under section 6502.

The document stated that this "arrangement would be treated as an installment agreement for purposes of the limitation on the late payment penalty in IRC § 6661(h)". Petitioners also wanted the IRS to agree that it would take no enforced collection actions while this agreement was in effect.

**[*10]** The document also stated that petitioners understood their proposal to be considerably more complex than a typical taxpayer proposal. Nevertheless, it concluded that it would be in the best interest of the IRS to receive these sporadic payments "that, over a period of time, approximately 15 years, should provide sufficient cash payments for full payment of the outstanding tax liabilities."

On January 13, 2014, the settlement officer read the proposal in an hour. His impression of it was that, essentially, petitioner planned to make an investment and pay the tax liability from the proceeds and that, because the proposal would require 15 years to pay off the liability, petitioners would consent to a 10-year extension of the period of limitations for collection. However, because of the case's complexity, including petitioners' protesting of the jeopardy assessment and the possibility of related issues being resolved with IRS Chief Counsel, he felt that this case was not ripe for a "payment alternative" at the Appeals Office-level and that it needed to "go into suspense". He also noted that the case file contained a compact disc (CD) and a page stating that the CD contained a Form 433-A for petitioners and Forms 433-B, Collection Information Statement for Businesses, for two of petitioner's trusts.

On February 14, 2014, the settlement officer placed petitioners' account for the years in issue in suspense. Around five weeks later, however, the settlement

**[*11]** officer's supervisor advised him that IRS Chief Counsel had affirmed that he could continue to work on this case despite the ongoing tax deficiency cases, and she reversed the case's "suspense" status on March 27, 2014. The settlement officer then reviewed Internal Revenue Manual (IRM) pt. 8.24.2, Jeopardy Levy Appeals. He concluded that the proposed 15-year installment agreement was not an acceptable collection alternative.

In following up on petitioners' case, the settlement officer called their representative on April 29 and May 12, 2014, but his calls were picked up by voice mail. During this interim, he checked the IRS database and determined that the total assessed balance on May 12, 2014, was $26,340,933.16 (adjustments apparently having had been made to petitioners' account on or around December 24, 2013). He also continued researching the IRM.

The settlement officer and petitioners' representative spoke on May 13, 2014. The settlement officer informed the representative that he could not accept petitioners' proposed 15-year installment agreement because it would not result in full payment of their liability within the collection period. The representative stated that petitioners' appeal of the jeopardy assessment had been denied, that they had not sought judicial review of the jeopardy assessment, and that they would owe additional tax.

[*12] The settlement officer and the representative then discussed petitioners' current finances. The representative asserted that petitioners did not have regular income to make payments, that they probably would not be able to access the equity in their home, that the home was held in a trust, and that petitioner had recently had a stroke. Nevertheless, he stated that he would ask petitioners to provide loan rejection notices. The conversation ended with the representative stating that he would call the settlement officer back by June 3, 2014.

On June 3, 2014, at 6:18 p.m., the representative left the settlement officer a voice message stating that petitioners could not "borrow or sell" with respect to their home and that he would send something in writing in the next couple of days. By June 30, 2014, however, the settlement officer had not heard back from the representative and reasoned that petitioners had missed the deadline to provide documentation showing that they could not borrow against equity or sell their residence. He determined that petitioners' principal residence was worth $16.2 million and was not the sort of residence that qualifies as a necessary living expense. If petitioners could not sell the house, he noted, then a determination would need to be made whether to seize it or request a suit to foreclose.

The settlement officer also confirmed petitioners' then-current tax liability balance to be $26,340,933.16. He had considered petitioners for a collection

[*13] alternative but was unable to offer one because they did not provide requested financial information. The settlement officer called the representative to inform him of his determinations, but the call was picked up by voice mail. The settlement officer left a message for the representative to call him back.

Not having heard back from the representative by the next day, July 1, 2014, the settlement officer finalized his determinations for the years in issue. In total he had spent over 28 hours in consideration of petitioners' case. The Appeals Office sent a notice of determination (upon which this case is based) to petitioners on July 21, 2014, wherein it sustained the filing of the NFTL and the levy actions by the IRS.

In an attachment to the notice, the settlement officer explained that petitioners did not request a withdrawal of the NFTL and that they did not submit evidence that the jeopardy levies were unnecessary. He addressed the two issues raised by petitioners--the collection alternative proposal and their challenge to the existence and the amount of liability--determining as follows:

> On Form 12153 you requested a collection alternative. You reside in a $16 million house with a $7 million mortgage, but declined or neglected to show that you cannot borrow or sell the house to reduce your tax liability.

**[\*14]** You requested a 15-year installment agreement; however, this
wasn't an acceptable resolution because it wouldn't result in full
payment of your tax liability within the collection statute.

\*　　\*　　\*　　\*　　\*　　\*　　\*

You disputed your liability with Appeals outside the CDP hearing.
Appeals upheld the liability.  You didn't file an appeal with the Tax
Court.  Liability wasn't considered in the CDP hearing.

The notice also stated:  "On June 3, 2014 your representative left a voice mail

message stating you can't borrow or sell your house and he would send something

in writing in the next couple of days.  We never received the requested financial

information from you."

The settlement officer affirmed that all legal and procedural requirements

had been met, that he had no prior involvement, and that the collection actions

taken or proposed were appropriate under the circumstances.  His determination

concluded that the liens and levies were appropriate and, under the circumstances,

no more intrusive than necessary.

OPINION

If a taxpayer fails to pay tax due after demand for payment, then the IRS is

authorized to file an NFTL and to collect the tax by levy against the taxpayer's

property.  Secs. 6321, 6323, 6331 (requiring a waiting period of 10 days for levy

after notice and demand); see also secs. 6331(a) (authorizing a jeopardy levy with

[*15] no waiting period), 6862(b).  Sections 6320 and 6330 provide that the Commissioner must give to a taxpayer notice of lien and levy matters and the opportunity for an administrative review in the form of a section 6330 hearing.  If dissatisfied, the taxpayer may seek judicial review of the administrative determination.  Secs. 6320(c), 6330(d)(1).

A taxpayer is allowed to raise "any relevant issue relating to the unpaid tax or the * * * levy" including spousal defenses, challenges to the appropriateness of collection actions, and alternatives to collection.  Sec. 6330(c)(2)(A).  Section 6330(c)(3) provides that the determination of the Appeals officer shall take into consideration the verification presented under section 6330(c)(1), the issues raised by the taxpayer, and whether the collection actions balance the need for the efficient collection of taxes with the legitimate concern of the taxpayer that any collection action be no more intrusive than necessary.

Challenges to the underlying tax liability may be raised if the person requesting the hearing did not receive any statutory notice of deficiency for the liability or did not otherwise have an opportunity to dispute the liability.  Sec. 6330(c)(2)(B).  To the extent that a taxpayer's underlying tax liability is an issue, we review the Appeals officer's determination de novo.  See Landry v. Commissioner, 116 T.C. 60, 62 (2001).  Where there is no dispute as to the

**[*16]** underlying tax liability properly before the Court, we review the actions of the settlement officer for abuse of discretion. See Swanson v. Commissioner, 121 T.C. 111, 119 (2003). Abuse of discretion may be found where an action is arbitrary, capricious, or without sound basis in fact or law. Giamelli v. Commissioner, 129 T.C. 107, 111 (2007); Woodral v. Commissioner, 112 T.C. 19, 23 (1999).

Petitioners make a blanket assumption that, because the settlement officer "spent virtually no time reviewing over 2,200 pages of relevant, timely information", the Court cannot review any issues in this case under the abuse of discretion standard. They cite Hoyle v. Commissioner, 131 T.C. 197 (2008), as authority that "failure to conduct a hearing" is "subject to de novo review".

Hoyle, however, does not address a "failure to conduct a hearing" much less what the appropriate standard of review is under such a circumstance. Moreover, the facts show that the settlement officer had conducted a section 6330 hearing, spending around 28 hours on petitioners' case, and that petitioners had already disputed their underlying tax liability for the years in issue through their tax deficiency cases before this Court and, apparently, their IRS appeal of the jeopardy assessment held separately from the section 6330 hearing. The standard of review, therefore, is abuse of discretion.

[*17] Petitioners also contest the scope of review, arguing that this Court may review facts outside the administrative record and that we must do so here because testimony is needed to explain the complicated facts of the administrative record. In support of this position they raise the potential uncertainty of their case's venue on appeal, favoring the Court of Appeals for the D.C. Circuit (where scope of review for this type of case has yet to be determined) over the Court of Appeals for the Ninth Circuit (where scope of review is limited to the administrative record, see Keller v. Commissioner, 568 F.3d 710, 718 (9th Cir. 2009), aff'g in part, vacating in part T.C. Memo. 2006-166). See sec. 7482(b)(1) (providing appellate venue for judicial review of this Court's cases). Thus, they contend that the testimony of their witness, petitioners' representative, should be admitted into evidence.

The testimony of petitioners' representative, received as an offer of proof, was credible. Nevertheless, it did not provide any new facts or substantively enhance any material facts found in the administrative record. Accordingly, and as made more apparent by reasons discussed below, we conclude that consideration of the testimony offered by petitioners' representative does not affect our determination, regardless of the venue on appeal and applicable scope of review. (Congress recently amended section 7482(b)(1), clarifying that the venue

[*18] for appeal for all of this Court's section 6330 hearing cases is the circuit of residence (e.g., the Ninth Circuit in this case) and not the D.C. Circuit. However, this amendment--applicable to petitions filed after December 18, 2015--does not apply here. See Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. Q, sec. 423, 129 Stat. at 3123-3124 (2015).)

Petitioners next argue that the settlement officer failed to verify that proper procedures had been followed in the authorization of the jeopardy assessment. Relying on Rev. Proc. 78-12, 1978-1 C.B. 590 and IRM pt. 4.15.3.2 as authority, they argue that the IRS "railroaded" through the jeopardy assessment without the necessary signatures of either the "Director Field Operations, South/West or the Area Director for California" on Form 2644. They also cite Swegles v. United States, No. CV 86-5514 MRP, 1987 WL 16950 (C.D. Cal. Feb. 27, 1987), for the proposition that where Form 2644 does not "reflect that appropriate approvals were obtained, the jeopardy assessment itself is invalid."

Swegles, however, never mentions Form 2644 and only, as background, refers to a jeopardy assessment that had been improperly approved. Likewise, Rev. Proc. 78-12, supra, does not reference Form 2644 and requires only approval, not a signature, by the "District Director of Internal Revenue". (In its reorganization of 1998 the IRS abolished the position of "district director"; thus,

**[*19]** while Rev. Proc. 78-12, <u>supra</u>, has not been updated to reflect this change, the duties of the position have been assumed by other employees, e.g., Area Directors, and collections procedures continue status quo. <u>See</u> <u>Grunsted v. Commissioner</u>, 136 T.C. 455, 460-61 (2011) (holding that an assessment was not rendered invalid by lack of IRS district directors after reorganization). <u>See generally</u> Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685 (requiring the Commissioner to eliminate or substantially modify the IRS' national, regional, and district structure, yet ensuring continuity of operations by keeping in effect regulations that refer to officers whose positions no longer exist).) Although IRM pt. 4.15.3.2 (Sept. 16, 2011) does remark on Form 2644, it, too, requires only approval (not signatures) of "the Area Director and Counsel." With those observations in mind we consider petitioners' argument.

During the section 6330 hearing process, the Appeals officer must verify that "the requirements of any applicable law or administrative procedure have been met." Sec. 6330(c)(1), (3)(A). Taxpayers are allowed to raise verification as an issue before this Court, even if they did not do so at their hearing. <u>See</u> <u>Hoyle v. Commissioner</u>, 131 T.C. at 202 (holding that this Court may review statutorily mandated issues, such as section 6330(c)(1) verification, that should have been

**[*20]** considered by the settlement officer whether or not they actually were). A jeopardy assessment may not be made unless the IRS Chief Counsel (or a delegate thereof) gives written approval of the assessment and, within five days after the jeopardy assessment is made, the Secretary provides the taxpayer with a written statement of information on which the Secretary relied in making the jeopardy assessment. Sec. 7429(a)(1).

The administrative record reflects that the settlement officer reviewed IRS transcripts and computer records of petitioners' account for the purpose of determining that all administrative procedures had been met. It also contains written approval executed by an appropriate delegate of IRS Chief Counsel and a written statement of germane information executed by the IRS SB/SE Area Director for California and dated October 31, 2012, one day after the assessment was made. See IRS Delegation Order No. 219 (rev. 4) (Aug. 26, 1997 (as updated Oct. 2, 2000, to reflect additional new IRS organizational titles)) (providing authority to approve jeopardy assessments and delegating that authority to, inter alia, Area Directors of the IRS SB/SE division); IRM pt. 30.3.2.4.3.1(3)(j) (providing that authority of IRS Chief Counsel to approve jeopardy assessments and jeopardy levies may be redelegated no lower than Associate Area Counsel). The requirements of section 7429(a)(1) are satisfied.

**[\*21]** Moreover, the settlement officer was aware that he was handling a jeopardy assessment and levy case, that the IRS had denied petitioners' appeal of the jeopardy assessment, and that petitioners had the right to seek judicial review of that denial but did not do so. We conclude that the settlement officer made the proper verification.

Petitioners next argue that the settlement officer failed to consider their payment proposal, which they reluctantly characterize as an installment agreement. At the time they made their proposal in 2013, they had requested that it be treated as an installment agreement "for purposes of the limitation on the late payment penalty in IRC § 6661(h)". (Because the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, sec. 7721, 103 Stat. at 2395, repealed section 6661 and replaced it with the accuracy-related penalty of section 6662, it is likely that petitioners had intended to refer to section 6651(h), which limits the penalty on an individual's failure to pay when an installment agreement is in effect.) Petitioners apparently also want to have the proposal regarded as an installment agreement for purposes of section 6502(a), which permits (but does not mandate) an exception to the 10-year period of limitations for collection in the case of an installment agreement. See sec. 6502(a)(2)(A).

[*22] The crux of petitioners' argument appears to be that the settlement officer could not have properly considered their 300-plus-page proposal or the financial information included on the CD. They allege that the time he devoted to their case was "wholly inadequate to represent any good faith consideration of petitioners' financial circumstances or collection alternatives".

Section 6159(a) authorizes installment agreements with taxpayers to facilitate collection of the their tax liabilities. Installment agreements allow taxpayers to make scheduled periodic payments towards their tax liabilities, and the acceptance or rejection of these agreements (other than a "guaranteed" installment agreement under section 6159(c), which is not applicable here) is within the discretion of the IRS. See sec. 301.6159-1(a), (c)(1)(i), (iii) Proced. & Admin. Regs. "As a condition to entering into an installment agreement with a taxpayer, the Commissioner may require that--(A) The taxpayer agree to a reasonable extension of the period of limitations on collection; and (B) The agreement contain terms that protect the interests of the Government." Id. para. (c)(3)(iii).

When determining whether a taxpayer's proposed installment agreement will facilitate collection of the liability under section 6159, the IRS makes a financial analysis of the taxpayer's monthly income and expenses and the

[*23] taxpayer's ability to pay.  See Etkin v. Commissioner, T.C. Memo. 2005-245, slip op. at 16.  Discretionary decisions made in response to an installment agreement proposed by a taxpayer will not be upset unless it is demonstrated that the decision was arbitrary in some way and could not be supported in law and in fact.  See Hult v. Commissioner, T.C. Memo. 2007-302, slip. op at 13 (citing Freije v. Commissioner, 125 T.C. 14 (2005), and Schulman v. Commissioner, T.C. Memo. 2002-129).

Petitioners speculate that because the settlement officer took only an hour to read the proposal, he could not have understood its complexity and, thus, could not have fairly made his decision to reject it.  However, it is not self-evident that the settlement officer could not have read their proposal in an hour and understood it--or understood enough of it to realize that it was unsuitable for the Government. The settlement officer determined that their installment agreement could not be accepted because it would not result in full payment of their liability within the period of limitations for collection.  That reason is a legitimate, nonarbitrary basis for his decision, and petitioners do not suggest any law or facts showing otherwise (including any law requiring the IRS to extend the period of limitations when considering an installment agreement).

[*24] Petitioners also take exception to the settlement officer's determination that they failed to provide financial information so that their collection alternative could be considered. They allege that the settlement officer requested Form 433-A through his February 4, 2013 letter, even though he already "had a complete Form 433-A and over 1,000 pages of supporting documentation in the CD". Nevertheless, they acknowledge that the settlement officer's determination may have been referring to "some other supposed request for financial information"--but that without his testimony "we are left to guess what this could be".

Contrary to petitioners' point of view, we can readily deduce what "missing" financial information the settlement officer was referring to in his determination. His case notes, made before his determination, focus on petitioners' representative's declarations that he would ask petitioners to provide loan rejection notices and that he would send written documentation of their inability to borrow against or sell their home. Similarly, and more definitively, the notice of determination addresses requested financial information only in the form of petitioners' inability to borrow against or sell their house--not Form 433-A. Given the context of the notice and the case notes, the more likely conclusion is that the missing information that the settlement officer referred to in his determination was the loan rejection notices or other such documentation.

**[\*25]** A taxpayer is expected to provide all relevant information requested by the Appeals Office for its consideration of the facts and issues involved in the hearing. See sec. 301.6330-1(e)(1), Proced. & Admin. Regs. With respect to installment agreements, as discussed supra, the IRS makes a financial analysis of the taxpayer's ability to pay, which inherently requires correct financial information.

There is sufficient evidence that petitioners' representative had discussed the loan rejection notices with the settlement officer and had agreed that petitioners would provide proper documentation. As this information (whether petitioners had access to $5 million of equity in their residence) was material to the settlement officer's consideration of a collection alternative, they were responsible for providing it. Cf. Kerr v. Commissioner, T.C. Memo. 2007-43, slip op. at 7-8 (rejecting the taxpayer's contention that the burden was on the settlement officer to develop any additional, requested information that might give reason to reject an offer-in-compromise). Petitioners therefore kept financial information, imperative for discerning their current financial status, from the settlement officer. Additionally, they did not make an offer of proof, in these proceedings, of any information regarding their financial condition that would suggest a remand is appropriate. See Wells v. Commissioner, T.C. Memo. 2003-234, slip op. at 8 n.6, aff'd, 108 F. App'x 440 (9th Cir. 2004).

**[*26]** We conclude that the settlement officer did not abuse his discretion in sustaining the collection actions to collect petitioners' unpaid tax for the years in issue. We have considered other arguments of the parties, but they are irrelevant, unsupported by the record or by authority, or otherwise without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.